(No. 33476.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALFRED BURKERT, Plaintiff in Error.

*Opinion filed November 23, 1955*

507

SCHAEFER, J., and HERSHEY, C.J., dissenting.

CRAWFORD & HEALY, of Waukegan, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and ROBERT C. NELSON, State's Attorney, of Waukegan, (JOHN

L. Davidson, Jr., Fred G. Leach, George W. Schwaner, Jr., and Kenneth R. Shorts, of counsel,) for the People.

Mr. Justice Maxwell delivered the opinion of the court:

This is a writ of error to review a judgment of the circuit court of Lake County convicting Alfred Burkert of contempt of court for his failure to answer questions before the grand jury, and sentencing him to the Illinois State Farm at Vandalia for a term of six months. The judgment followed the entry of an order granting Burkert immunity under the witness immunity statute enacted in 1953. (Ill. Rev. Stat. 1953, chap. 38, par. 580a.) Although the offense was a misdemeanor, the writ of error was properly sued out of this court because a construction of the constitution is involved.

The Witness Immunity Act, upon which the proceeding against Burkert was based, provides: "Whenever, in any investigation before a grand jury or trial in a court of record of any person charged with a criminal offense (either felony or misdemeanor), it shall appear to the court that any person called as a witness in behalf of the prosecution is a material witness and that his testimony or any evidence he may produce, documentary or otherwise, would tend to incriminate him, on motion of the State's Attorney the court may cause an order to be entered of record that such witness be released from all liability to be prosecuted or punished on account of any transaction, matter or thing concerning which he may be required to testify or produce evidence, documentary or otherwise; and such order shall forever after be a bar to any indictment, information or prosecution against the witness for any felony or misdemeanor shown in whole or part by such testimony or evidence, documentary or otherwise, except for perjury committed in the giving of such testimony; provided however, that the court shall deny a motion of a State's Attorney made under this section and shall not enter an order

releasing such witness from such liability if it shall reasonably appear to the court that such testimony or evidence, documentary or otherwise would subject such witness to an indictment, information or prosecution (except for perjury committed in the giving of such testimony) under the laws of another State or of the United States; * * *. Any witness who, having been granted immunity as aforesaid, refuses to testify or produce evidence, documentary or otherwise, may be punished for contempt of the court and sentenced to the county jail for not more than two years." Ill. Rev. Stat. 1953, chap. 38, par. 580a.

On July 8, 1954, Burkert appeared before the grand jury of Lake County, which was then engaged in an investigation of gambling. He was asked a number of questions which he declined to answer on the ground of self incrimination. The following morning the State's Attorney filed a petition in the circuit court which set forth the questions and Burkert's responses, recited that Burkert was a material witness and that his testimony would tend to incriminate him, and prayed for the entry of an immunity order pursuant to the statute.

Burkert was thereupon brought before the court. His request to be represented by counsel was denied. The court explained to him the purpose of the proceeding and the effect of an immunity order, and advised him that from the face of the petition the court saw no reason why the witness would be subject to prosecution under the laws of the United States or of any other State, and asked him if he had anything to add to what was contained in the petition. Burkert stated that he had nothing to add, but would like to talk to his attorney. The court then entered an order which required him to answer such relevant and material questions as might be put to him, and granted him immunity from prosecution for any matters concerning which he might be required to testify.

Later on the same day, before he had been taken back

before the grand jury, Burkert again appeared before the court, accompanied this time by his attorney, who made an oral motion to vacate the immunity order. A hearing was had at which it was disclosed that Burkert had been arrested on June 12 on a charge of operating a handbook, and was awaiting trial before a police magistrate. Burkert took the stand at this hearing. His counsel asked him several questions relating to his compliance with the various Federal statutes and regulations applicable to persons engaged in the occupation of taking wagers. (See 26 USC 4401-4414.) Burkert stated that he had held a Federal occupational gambling tax stamp during fiscal 1953, but he declined to state, on the ground that his answers might incriminate him, whether he presently held such a stamp, whether he had filed informational returns required by the Federal statute, and whether he had paid the Federal tax of ten per cent of the gross amount of wagers handled by him. He also stated that to answer the questions asked him before the grand jury would tend to incriminate him under the laws of the United States.

After the hearing the court amended its immunity order to provide that Burkert should not be required to give any testimony relating to any matter or transaction occurring after June 30, 1953. Burkert was then taken before the grand jury and asked a number of questions similar to those previously asked of him, but qualified to conform with the time limitation contained in the court's amended order. He was asked what his occupation had been from July 1, 1952, to June 30, 1953; where he had worked in 1952, in 1948, and in 1938; whether he knew of any gambling activities in Lake County; whether he knew of any vice or prostitution there; and whether he was acquainted with two named persons. Burkert again refused to answer any of these questions on the ground that his answers might incriminate him under the laws of Illinois or of the United States.

On July 13 the State's Attorney filed a petition for a rule on Burkert to show cause why he should not be held in contempt. Burkert filed an answer which admitted that he had refused to answer before the grand jury. So far as the questions as to where he had worked in 1948 and 1938 were concerned, the answer based his refusal solely on the fear of incrimination under Illinois law, and he offered to answer these questions upon condition that his answers should not be used against him in any criminal procedings, and that his privilege in respect to other questions should not thereby be deemed to be waived. As to the remainder of the questions Burkert justified his refusal to answer on the ground of possible incrimination under the Federal statutes and regulations relating to the tax imposed on persons engaged in accepting wagers, a list of which was included in the answer. The obvious purpose of the answer was to suggest that truthful replies to the questions asked would have disclosed violations of Federal law or would have furnished clues from which such violations could be discovered.

On July 23 the court, after denying a motion by defendant for a continuance of ninety days, and a request for a jury trial, adjudged him guilty of contempt. The imposition of sentence was deferred for one week to afford the defendant an opportunity to appear again before the grand jury if he desired to do so. He did not choose to appear, and he was committed to the Illinois State Farm in Vandalia for a term of six months.

The first contention of the defendant is that he was deprived of the right to counsel. This contention is readily disposed of. At the first hearing on July 9 the court did deny defendant's request for counsel. But at the subsequent hearing held that day upon the motion to vacate defendant was represented by his attorney, who offered evidence and advanced arguments in his behalf. He thus had effective representation by counsel before the immunity

order was acted upon, and he was represented at all times thereafter. It is therefore unnecessary to consider whether a witness is entitled to counsel upon an application for the entry of an immunity order. See *People* v. *Cochrane,* 307 Ill. 126; cf. *People* v. *Zazove,* 311 Ill. 198.

Plaintiff in error's second contention is that he was deprived of his constitutional right to a trial by jury upon the question of whether or not his refusal to answer before the grand jury constituted contempt. This contention has its point of departure in *People* v. *Gholson,* 412 Ill. 294. Prior to that decision this court had held that in cases of indirect criminal contempt the sworn answer of the alleged contemner denying the facts upon which the charge was based must be accepted as conclusive, and that he was thereupon entitled to be discharged. (*People* v. *McDonald,* 314 Ill. 548.) If his answer was false, he could be prosecuted for perjury, but his sworn answer effectively purged him of contempt. This anachronistic doctrine of purgation by oath was abandoned in the *Gholson case.* Cf. *People* v. *Ryan,* 410 Ill. 486, 490.

Defendant's argument is that since under the old practice he would have been entitled to a trial by jury on an indictment for perjury, the issue of whether a contempt had been committed was thus triable by a jury at common law. Therefore, so runs the argument, section 5 of article II of the constitution preserves that right, and since the *Gholson case* permits the determination of whether a contempt occurred to be made in the contempt proceeding itself, that proceeding requires a jury trial.

In reply to this argument the People contend that the former doctrine of purgation by oath was limited to "indirect" contempts, while the contempt committed here was "direct," since it took place before the grand jury. Our decisions indicate that a refusal to answer before the grand jury is a direct contempt. (See *People* v. *Cochrane,* 307 Ill. 126; *People* v. *Sheridan,* 349 Ill. 202.) But the

precise question of whether a sworn denial would discharge one charged with a refusal to testify does not appear to have been passed upon. We do not agree with defendant's argument that a constitutional right of trial by jury can be distilled from an analogy to the perjury prosecution which might have followed under the former practice of purgation by oath, for the contempt proceeding was terminated by the sworn answer, and the perjury prosecution was an independent criminal proceeding. The present case, however, does not present the issue sought to be raised, for here the defendant admitted his refusal to answer before the grand jury. There was thus no factual issue to be tried, by jury or otherwise.

Defendant's right to a continuance, which he contends was wrongfully denied, was in the sound discretion of the court. The continuance requested here would have delayed the proceedings beyond the duration and jurisdiction of the particular grand jury, when the cogency of his testimony would no longer exist, and since defendant had admitted the nature of his alleged contempt at a hearing in open court, the denial of the continuance cannot be deemed an abuse of discretion.

In determining defendant's further contention that the entry of the immunity order was contrary to the Witness Immunity Act and in violation of defendant's privilege against self incrimination, reference must be made to the section of the statute, heretofore quoted, which is section 274 of division I of the Criminal Code. It is provided therein that an order may be entered upon application of the State's Attorney to grant a material witness immunity from prosecution under Illinois law based upon testimony or other evidence adduced by the witness, and that upon the entry of the immunity order the witness is required to testify or adduce evidence or suffer punishment for contempt. There is a further proviso "that the court shall deny a motion of a State's Attorney made under this section and

*shall not enter an order releasing such witness from such liability if it shall reasonably appear to the court that such testimony or evidence * * * would subject such witness to an indictment, information or prosecution * * * under the laws of another State or of the United States."* (Italics supplied.)

In the absence of such a proviso, where the immunity statute gives the witness protection against the government compelling the witness to answer, that is regarded as equivalent to the protection given him by the rule against self incrimination, and the witness may be compelled to testify. (58 Am. Jur. 75; *People* v. *Rockola,* 346 Ill. 27.) With the exception of the Michigan decisions (*In re Ward,* 295 Mich. 742, 295 N.W. 483,) the more recent cases hold that the inability of a State to provide immunity from Federal prosecution arising out of the testimony given in State proceedings does not constitute grounds for a witness refusing to testify. (38 A.L.R. 2d 257, 267.) Consequently, any assertion of privilege in a State court proceeding based upon danger of prosecution under Federal law must be predicated on statutory grounds. 58 Am. Jur. 53.

However, under the Illinois statute, as hereinbefore noted, the legislature has prescribed that no immunity order may be entered where there may be a danger of Federal prosecution. Under these circumstances the witness in a State court proceeding, as in the case at bar, is given the protection of the fifth amendment of the Federal constitution, as well as of section 10 of article II of the Illinois constitution. Therefore, in determining whether the immunity order was properly issued, we must re-examine the decisions of the Supreme Court of the United States, which are authoritative in construing both the fifth amendment and the comparable section of the Illinois constitution. *Halpin* v. *Scotti,* 415 Ill. 104.

The Supreme Court of the United States, in a substantial body of precedent, has considered the scope of the

privilege against self incrimination under the fifth amendment. (Meltzer, Privilege Against Self Incrimination, 18 Univ. Chi. L. Rev. 687.) In the recent case of *Emspak* v. *United States,* 349 U.S. 198, the court reviewed the authorities and re-affirmed the test enunciated in *Hoffman* v. *United States,* 341 U.S. 479, which the court regarded as being declarative of the rule stated by Chief Justice Marshall in the early case of *United States* v. *Burr,* 25 Fed. Cas. 403.

In the *Hoffman case* the defendant was asked before a Federal jury investigating various Federal crimes, including violations of the narcotics law, what his present occupation was, whether he knew the present whereabouts of one Weisberg for whom a *subpoena* had been issued but who had not been served, and when he had last seen Weisberg or spoken to him on the telephone. The witness refused to answer the questions and was held guilty of contempt by the district court, which judgment was affirmed by the Court of Appeals, notwithstanding the fact that defendant had filed a supplement to the record disclosing that he had been publicly charged with being a racketeer, and that while waiting to testify he had been photographed with an official of the Bureau of Narcotics "in an accusing pose." The Supreme Court reversed the judgment, and explained that while the witness's own claim of privilege did not establish the risk of incrimination, and that the matter was one for the court to decide, nevertheless, to sustain the privilege it need only be evident from the implications of the question in the setting in which it is asked that a responsive answer to the question, or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result, and that consequently the privilege included answers that might furnish a link in the chain of evidence needed to prosecute the witness for a Federal crime.

The court thereupon held that an answer to the ques-

tions concerning Weisberg's activities might have proved incriminating since, in view of defendant's police record and long acquaintance with Weisberg defendant might have aided him to conceal himself to avoid being brought before the grand jury. The court also held that the question relating to defendant's occupation might also be incriminating, and suggested that the trial judge should have considered, in view of the broad scope of the investigation, that the chief occupation of some of the persons called as witnesses might be the evasion of Federal law. Hence the court concluded that in the particular setting, it was not "perfectly clear that the witness was mistaken, and that the answers could not possibly have had a tendency to incriminate him."

The *Hoffman case* was deemed determinative in the summary opinions in *United States* v. *Greenberg,* 341 U.S. 944, and *United States* v. *Singleton,* 343 U.S. 944, where the court reversed contempt convictions where the witnesses refused to answer questions relating to their respective occupations, and whether they knew certain named persons, and other questions, seemingly innocuous on their face, before the same grand jury.

In accordance with this approach of the Supreme Court of the United States, the Court of Appeals in *United States* v. *Coffey,* 198 F. 2d 438, held that a witness's refusal to answer whether two named individuals were engaged in the numbers racket did not constitute a contempt. The court states: "It is enough that the trial court be shown by argument how conceivably a prosecution, building on the seeming harmless answer might proceed step by step to link the witness with some crime against the United States, and that this suggested course and scheme of linkage 'not seem incredible' in the circumstances of the particular case."

In the analogous case of *United States* v. *Girgenti,* 197 F. 2d 218, the Court of Appeals considered whether a witness could assert the protection of the fifth amendment or

was guilty of contempt for refusing to answer the question, "Now who operated the Maple Shade Gambling House?" The witness submitted State court records of indictments and convictions for keeping a gambling house, newspaper clippings referring to him as a gambler, and reports of investigations and letters from the internal revenue service relating to his failure to file certain returns, which evidence the court referred to as character testimony in reverse, indicating that whatever the witness happened to be doing at the time was probably illegal. The witness therein argued, as does defendant in the instant case, that by revealing his occupation as owner or manager of the property he would aid a prosecution against himself for a Federal offense such as failing to file the required partnership, social security or other returns under Federal tax laws, and that the Federal constitution protects him from being led into such a trap. In sustaining this argument the court concluded that Girgenti had made a sufficient showing to entitle him to the protection of the privilege against self incrmination, and set forth the policy considerations underlying its decision: "If our conclusion permits in the individual case a rascal to go unwhipped, or a villain unhung, it is because Americans have thought it better public policy to lose a conviction now and then, than to force a conviction from the defendant's own mouth."

In the instant case, as in the *Hoffman case,* defendant refused to answer what his occupation was during certain years, whether he knew certain designated individuals, reputed to be gamblers, and also whether he knew of gambling activities, vice, or prostitution in Lake County. At the time of asserting his privilege against self incrimination and refusing to answer, defendant had submitted evidence similar in nature to that presented in the *Girgenti case,* showing that he had a Federal gambling stamp for 1953; that he had been arrested on June 12, 1954, on a charge of operating a handbook and was awaiting trial

before a police magistrate; that a newspaper article at the time of his arrest alluded to the fact that he was operating a handbook for a known gambler. This evidence not only constituted character testimony in reverse, indicating that defendant was the type of individual who could be expected to be in trouble with the law, as suggested in the *Girgenti case,* but it provided the basis for inferring that defendant's answers to these questions could reasonably furnish a link in aiding a Federal prosecution for his failure to file certain returns and keep certain records relating to the "business of accepting wagers," as provided under Federal law. Consequently defendant's apprehension of Federal prosecution if he were to answer the questions, and the scheme of linkage between the probable answers and some Federal crime, was neither fanciful nor "incredible" under the test enunciated in the *Coffey case.*

Moreover, as stated by the court in that case, in determining whether a witness really apprehends danger in answering a question a court cannot be skeptical, but rather must be acutely aware that "in the deviousness of crime and its detection, incrimination may be approached and achieved by obscure and unlikely lines of inquiry."

Under the circumstances here, measured by the standards and rules set forth in the *Hoffman case* and subsequent decisions, it was not "perfectly clear" that defendant Burkert was mistaken or that the answers to the questions propounded to him could not possibly have a tendency to incriminate him under Federal law. We believe therefore, that he was properly entitled to the protection against self incrimination afforded by the terms of the Illinois Witness Immunity Act, and the immunity order issued was not in accordance with the statute and was therefore void. Hence defendant's refusal to answer any of the questions where there was no immunity whatever granted could not be deemed a contempt of court.

The judgment finding defendant guilty of contempt is therefore reversed.

*Judgment reversed.*

Mr. JUSTICE SCHAEFER, dissenting:

I agree with the court's disposition of the defendant's claims that he was deprived of the right to counsel and of the right of trial by jury, and I agree that the trial court did not err in denying the continuance which the defendant requested. I do not agree that the immunity order entered by the trial court was improper. The question is important because every exemption from the basic obligation of the citizen to testify to what he knows impedes the administration of justice.

The opinion of the court assumes that the question for decision is the incriminating character of the specific questions put to the witness before the grand jury. Ordinarily, after a witness has refused upon the ground of self-incrimination to answer questions before the grand jury, he is brought before the court which then determines as to each question whether or not the privilege was properly invoked and orders the witness to answer those questions which are not privileged. (Cf. *People* v. *Rockola,* 346 Ill. 27.) As I read the immunity statute it contemplates a different procedure. It is concerned with the circumstances which are made to appear to the trial court prior to the entry of an immunity order, and not with the incriminating quality of specific questions put to the witness after the entry of an immunity order.

The statute says that the court "shall not enter an order releasing such witness from such liability if it shall reasonably appear to the court that such testimony or evidence, * * * would subject such witness to an indictment, information or prosecution * * * under the laws of another State or of the United States * * *. Any witness who, having been granted immunity as aforesaid, refuses to testify or produce evidence, documentary or other-

wise, may be punished for contempt of the court * * *."
(Ill. Rev. Stat. 1953, chap. 38, par. 580a.) This statute
conditions the trial court's authority to enter an immunity
order upon its appraisal of the information before it when
the order is entered. If the immunity order is justified
upon the showing made at that time, no privilege attaches
with respect to specific questions thereafter directed to the
witness.

The test fixed by the statute is whether "it shall reason-
ably appear to the court" that the witness's testimony would
subject him to a Federal prosecution. In lieu of that test
the court substitutes the very different requirement that it
must be "perfectly clear that the answers to the questions
propounded to him could not possibly have a tendency to
incriminate him under Federal law" before an immunity
order is entered. The test thus substituted is not only un-
authorized by the statute; it goes beyond any holding of
this court when the question of the incriminatory character
of a particular question was directly involved.

The circumstances before the trial court in this case
showed that the witness had secured the stamp required
under the Federal statute for the period terminating July 1,
1953. The court's order directed that the questions put to
the witness be limited to that period. It is not enough, it
seems to me, to show that there are other Federal require-
ments in connection with the making of returns and the
keeping of records with which the witness may not have
complied. I see no "reasonable" basis for inferring that
the witness complied with some of the requirements of the
applicable Federal law and not with others. It is more
reasonable, it seems to me, to infer full rather than partial
compliance, and that is what the trial court did.

But even upon the construction of the statute which the
opinion of the court seems to adopt, I would hold that the
questions here involved are not incriminatory. The con-
trary result is reached upon the basis of *Hoffman* v. *United*

*States,* 341 U.S. 479, and some memorandum decisions of the Supreme Court of the United States following that case. The holding of the *Hoffman case* that the witness's claim of self-incrimination must be sustained "unless it is perfectly clear * * * that the witness is mistaken and that the answer cannot possibly" tend to incriminate is new in the Federal system and new in Illinois. McCormick on Evidence, sec. 129.

The question which on its face calls for an incriminating answer does not cause much difficulty in judicial administration of the privilege against self-incrimination. The hard problems are raised by those questions which upon their face are innocuous but which nevertheless are said to tend to incriminate. It has been settled since Chief Justice Marshall's decision in *United States* v. *Burr,* 25 Fed. Cas. 38, that a witness may not determine for himself the incriminating quality of the questions put to him, for to allow him to do so would be to close the door to permissible investigation. That determination rests with the judge. On the other hand, because the witness cannot put before the judge all of the circumstances which cause him to fear possible incrimination by reason of his answer without forfeiting his privilege, the courts have accepted the witness's claim of privilege where it reasonably appeared that the answer might tend to incriminate. In dealing with the paradox which the privilege thus presents, the courts have appraised the incriminating quality of the question in terms of the setting in which it was asked. McCormick on Evidence, sec. 129; 8 Wigmore, Evidence, sec. 2260ff; Falknor, "Self-Incrimination Privilege: 'Links in the Chain,'" 5 Vand. L. R. 479; Meltzer, "Required Records * * * and the Privilege Against Self-Incrimination," 18 U. of Chi. L. R. 687.

The circumstances in the present case differ widely from those involved in the Federal decisions relied upon by the court. In each of those cases a Federal grand jury was

investigating Federal crimes with a view to Federal prosecution. In the present case the inquiry was being conducted before a State grand jury. The subject of the inquiry was the existence of offenses against the laws of the State. To secure possible evidence against others, immunity from State offenses was granted to the witness. The record does not suggest that Federal law enforcement officials had indicated the slightest concern with the activities of the defendant.

The questions asked of the defendant fall into six groups: (1) What was your business or occupation during the period from July 1, 1952, to June 30, 1953? (2) Where did you work prior to July 1, 1953? (3) Did you know David Cohen or Harry Siegel prior to July 1, 1953? (4) do you know of any gambling in Lake County prior to July 1, 1953? (5) Do you know of any vice or prostitution in Lake County prior to July 1, 1953? (6) Where did you work in 1938 and 1948?

So far as the sixth group is concerned defendant's answer to the rule to show cause admitted that his refusal to answer was based solely on a supposed apprehension of prosecution under the laws of Illinois. As to State prosecution, he had been granted immunity. His refusal to answer these questions was therefore not justified, nor was he entitled to impose conditions upon his undertaking to answer. That refusal, without more, would be enough to sustain the judgment below. (*People* v. *Rockola*, 346 Ill. 27.) It may be that the fifth question should be regarded in the same light. Because of the ambiguous quality of the term "vice," however, it may be treated as the equivalent of the fourth question, directed to knowledge of gambling.

The first four questions do not on their face call for answers which would tend to incriminate defendant under the Federal statutes relating to the wagering tax. To show their incriminating tendency despite their innocuous appearance, defendant before the trial court and in his brief in

this court has listed the duties imposed upon one who engages in the business of accepting wagers, and the penalties attached to a failure to discharge those duties. His argument is essentially that answers to the question asked would disclose that defendant, during the year 1953, had been engaged in the business of taking wagers, that there are various duties imposed upon persons so engaged, that it is possible he may not have complied with them, and that the admission that he was in such an occupation at all was therefore one step toward Federal prosecution.

The basic flaw in this argument lies in the fact that defendant had already testified that he held a Federal wagering tax stamp for the period which the questioning covered. An answer to the question as to his occupation, therefore, would call for nothing more than what was a matter of public record and was already known to the court. The same may be said of the question as to whether he knew of any gambling in Lake County. The question as to his acquaintance with Siegel is innocuous, for nothing appears in the record concerning Siegel. As to Cohen, the question is closer, for Burkert's attorney stated that a newspaper quoted police officers as saying that Burkert had said, apparently at the time of his arrest, that he "was operating a handbook for Mr. David Cohen." But even here it does not appear that subsequent questions would necessarily have called for incriminating answers, for succeeding questions might well have been framed to elicit defendant's knowledge of activities of Cohen in which the witness did not participate.

The case before us thus differs from *Hoffman* v. *United States*, where an answer to the question as to defendant's occupation might have revealed incriminating matter not already known. And the question in that case as to the whereabouts of an acquaintance who was apparently evading service of a *subpoena,* differs both in form and substance from the inquiries made here. Applying the standard

of the *Hoffman case* to the questions asked here should not, in my opinion, alter the result. (Cf. *Rogers* v. *United States,* 340 U.S. 367.) I would therefore hold that the judgment of the circuit court should be affirmed.

Mr. CHIEF JUSTICE HERSHEY concurs in the foregoing dissenting opinion.