THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON COOPER, Defendant-Appellant.

First District (6th Division) No. 1—87—3700

Opinion filed August 17, 1990.

Michael J. Pelletier and Linda Eigner, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, David R. Butzen, and Howard D. Weisman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RAKOWSKI delivered the opinion of the court:

Defendant Aaron Cooper was found in direct contempt of court for refusing to testify at trial. The trial court imposed a six-month sentence to be served consecutively to a previously imposed six-year sentence for an unrelated offense. Defendant now appeals the order finding him in contempt of court, and he contends he asserted a valid fifth amendment privilege against self-incrimination for crimes of murder, obstruction of justice and perjury.

On October 13, 1986, Rodney "Pretty Boy" Williams was found shot to death in an empty apartment occasionally used by drug addicts as a "shooting gallery," located at 1376 W. 79th Street, in Chicago, Illinois. At the time Williams was killed, he was preparing to inject illegal drugs.

Several weeks later, during the early morning of October 27, 1986, Chicago police officers Williams Gettings and Theodore Roberts responded to a report of a domestic disturbance at a home located at 1262 W. 72nd Place. Jacqueline Cooper had called police to arrest her son, the defendant, for disorderly conduct. According to the State, at the time of his arrest defendant said to his mother in the presence of the officers, "I don't know why you're having me arrested. You should have your killer son arrested." According to Gettings, defendant then asked the officers if they knew about the killing of "Pretty Boy" on 79th Street some weeks earlier. When the officers replied that they did not, defendant said that his brother, Eugene Cooper, had committed the crime.

Officers Gettings and Roberts then transferred custody of defendant to police officers George Klinger and John Nieciak, who transported defendant to 7th District police headquarters. According to Officer Klinger, while the three were en route, defendant told the officers that Eugene Cooper had called Jacqueline Cooper and asked her to drive him somewhere. Defendant had advised her not to get involved, which angered her. Defendant also asked Klinger and Nieciak if they knew who had killed "Pretty Boy." They responded that they did not, but advised defendant that they would get in touch with detectives from Area Two Violent Crimes. According to the officers, defendant appeared angry, talked continuously, but was understandable, clear and concise.

Once Klinger, Nieciak and defendant arrived at the 7th District, Klinger called an investigator at Area Two to advise him that they had an individual in custody who claimed to have information regarding the murder of "Pretty Boy." This investigator was aware of the incident and dispatched two officers to the 7th District to speak with defendant.

After these two officers arrived, they took defendant to a second police station located at 111th Street, where he was questioned more extensively by four detectives. According to the State, defendant told these detectives that he was angry with his brother and mother because he had been arrested for disorderly conduct. Defendant related that in early October, his brother, Eugene Cooper, had come to Jacqueline Cooper's home and told defendant and Ms. Cooper that four men had beaten him with a baseball bat because they were angry about a narcotics deal which had turned sour. At that time, Eugene Cooper had displayed the bruises he received as a result of the beating. Defendant told detectives that his brother referred to the persons who beat him as "Black Jack," "Goo," and "Pretty Boy." Eugene Cooper said that he would kill them all. Defendant's mother then gave Eugene Cooper a .38 caliber gun.

According to the State, defendant also told detectives that a week after this initial discussion, Eugene Cooper returned to his mother's home and told defendant and Ms. Cooper that he had just shot and killed "Pretty Boy." Defendant also said that his brother had given the murder weapon to their mother, who took it the next day to her safety deposit box at the Chicago Bank of Commerce. Ms. Cooper apparently kept several family guns in this safety deposit box, including a gun defendant had used in an earlier shooting for which he had been convicted. Defendant related to detectives that Ms. Cooper had later returned from the bank with two different guns which she gave to both of her sons for their protection. Defendant said that he had carried his gun for three days, but had gotten scared because he was a convicted felon and had given it back to his mother.

Defendant remained in police custody and was taken on October 27, 1986, to the criminal courts building at 26th and California, where he was interviewed by Assistant State's Attorney Michael O'Donnell. According to the State, defendant substantially repeated the statements he had previously made to police. Defendant also told O'Donnell that when his brother reported that he had been beaten, defendant had asked him whether he wanted to return to "get the guys" who beat him but that his brother had said he would take care of it himself.

Shortly after being interviewed by O'Donnell, defendant was questioned by Assistant State's Attorney James Kogut in the presence of the grand jury. Defendant testified to essentially the same version of events that the State claims he related to police. Defendant supplemented by testifying that a few days after his brother was beaten, he himself had had a conversation with "Pretty Boy" on 79th Street to

learn what had happened. Defendant also testified in response to a question regarding who had hit his brother:

> "Wait a minute, only one guy hit my brother. Pretty Boy and the other guy was on the door so he couldn't get out and Goo was trying to stop the guy from hitting my brother with the bat."

Defendant further testified that his brother began telling defendant that he had just killed "Pretty Boy" by advising defendant to avoid 79th Street because things were going to be "hot." Defendant stated that he was testifying without threat under his own free will.

Following defendant's testimony before the grand jury, a subpoena was issued for bank records which documented two recent visits by Jacqueline Cooper to her safety deposit box. A search warrant was issued for the contents of the box, and five guns were recovered, including one determined by scientific evidence to be the weapon used to kill "Pretty Boy."

On May 17, 1987, defendant was interviewed by his brother's attorney, Ahmed Patel. During this taped interview, defendant denied making the statements the State claims he made to the police at the time of his arrest. He told Patel that he had been drunk when the police arrested him, and that for 12 hours prior to his arrest he had been drinking, consuming four or five quarts of wine and several six-packs of beer. Defendant said that although he received an "I-bond," the police did not allow him to go home, but took him from the 7th District to the second police station and placed him in a room until he was sober. The next morning police advised him of these statements which the police had documented. Defendant told Patel that he told police that he did not remember making the statements and that if he had made them, he had been drunk and mad at his mother and that the statements were lies. According to defendant, police then threatened to charge him with the murder of "Pretty Boy" and assured him that he would receive the maximum sentence on a pending attempted aggravated arson charge if he did not testify to support the statements. Supposedly, the police said that they did not really care who killed "Pretty Boy," but they just wanted to get defendant to testify before the grand jury.

Two weeks before trial, defendant was interviewed by Assistant State's Attorneys Larry Crown and Gayle Shines and Detective Brownfield. According to defendant, the two assistant State's Attorneys told him that his mother had or was prepared to implicate him in possession of the murder weapon, and his brother had or was prepared to implicate him in the murder.

On November 18, 1987, prior to Eugene Cooper's trial, the trial court conducted a hearing to determine whether defendant, as a witness subpoened to testify, could validly invoke a fifth amendment privilege against self-incrimination. The trial court heard substantially all statements that the State alleged defendant made to police, assistant State's Attorneys, the grand jury, and attorney Patel; the evidence uncovered by a subpoena of bank records and a search of Jacqueline Cooper's safety deposit box; and that the State declined to grant defendant immunity. The trial court, nonetheless, found that defendant's fear of self-incrimination for charges of murder, obstruction of justice and perjury was not well founded and that he could not validly invoke the fifth amendment privilege with regard to questions posed by the State at his brother's trial. The trial court further advised defendant that if he did not answer such questions at trial, he would be held in direct contempt of court and sentenced accordingly.

During Eugene Cooper's trial held on December 2, 1987, defendant was called to the witness stand by the State. After answering preliminary questions regarding his age, his relationship to Eugene Cooper, and his criminal record, defendant invoked the fifth amendment in response to a question about where he had lived in 1986. During recess, the trial court reiterated its prior ruling and ordered defendant to testify. The State then conducted direct examination of defendant. To all questions posed, defendant responded that on the advice of his attorney he declined to answer and invoked the fifth amendment. The defense cross-examined defendant, including questioning him concerning his knowledge and experience with guns, but defendant similarly invoked the privilege in response to all questions. On the following day of trial, the trial court found defendant in direct contempt of court and sentenced him to a term of six months' imprisonment to be served consecutively to a previously imposed six-year sentence for an unrelated offense.

The fifth amendment guarantee against testimonial compulsion ensures that no witness will be required to give testimony that may tend to incriminate him. (*People v. Thornton* (1983), 120 Ill. App. 3d 983, 986-87, 458 N.E.2d 1150.) However, the fifth amendment right against self-incrimination may only be exercised where the witness has reasonable cause to suspect the possibility of subsequent prosecution from a direct answer. (*People v. Prater* (1987), 158 Ill. App. 3d 330, 336, 511 N.E.2d 842.) The privilege extends not only to answers that would in themselves support a conviction but also to answers that might furnish a link in a chain of evidence needed to prosecute the witness for a crime. (*Hoffman v. United States* (1951), 341

U.S. 479, 486-87, 95 L. Ed. 1118, 1123-24, 71 S. Ct. 814, 818; *People v. Burkert* (1955), 7 Ill. 2d 506, 131 N.E.2d 495.) A witness may be denied the privilege only when it is "perfectly clear, from a careful consideration of all the circumstances in the case," that the answers sought "cannot possibly have [a] tendency" to incriminate. (*Hoffman v. United States*, 341 U.S. at 488, 95 L. Ed. at 1125, 71 S. Ct. at 819.) The trial court, not the witness, must decide whether that witness has a valid basis for invoking the fifth amendment right against self-incrimination. (*People v. Schultz* (1942), 380 Ill. 539, 544, 44 N.E.2d 601.) Additionally, the right must not be extended to cover imaginary dangers and must not, in any event, be permitted to be used solely for the purpose of protecting a third party from prosecution. *People v. Schultz*, 380 Ill. at 544.

Defendant argues that his answers to the questions posed by the State and attorney Patel would have tended to incriminate him with respect to either murder, solicitation of murder, conspiracy to commit murder, obstruction of justice, perjury, or illegal possession of a firearm.

In this regard, defendant compares his situation to that of the two witnesses in *United States v. Chalan* (10th Cir. 1987), 812 F.2d 1302, where the court determined that the trial court had properly granted the witnesses a blanket privilege not to testify. In *Chalan*, both witnesses had made statements to investigators which placed them, defendant and another person near a convenience store where an armed robbery and murder had occurred shortly before the commission of the crimes. Their statements also revealed that one of the witnesses had destroyed a gun which all four men had been using prior to the crimes. In addition, other witnesses testified that four men who appeared intoxicated were near the store just prior to the crimes on the afternoon of the incident. The court found that the witnesses' testimony revealed that: (1) they had both been intimately involved in the activities of the accused on the afternoon in question; (2) they were both near the crime scene shortly before the commission of the crime; (3) one of them had destroyed a weapon that had been used that afternoon; and (4) one witness was associated with the owner of one of the suspected weapons. While the court recognized that this information could not directly support a conviction, it stated that "it furnish[es] a link in the chain of evidence needed to prosecute the witnesses." *United States v. Chalan*, 812 F.2d at 1310.

Defendant's involvement here, however, as revealed by his prior statements to the authorities, pales by comparison. Defendant never placed himself at or near the scene of the crime, neither did other evi-

dence indicate that possibility. Defendant never said that he was in any way involved in his brother's activities on the day and near the time that "Pretty Boy" was killed. In fact, defendant's statements were to the effect that he was both temporally and spatially removed from the crime and learned of it only after his brother warned him to avoid the area where it had occurred. Furthermore, defendant's only involvement with the murder weapon was to view it as it was given by his brother to their mother. Defendant's knowledge of the weapon's later whereabouts was not uniquely his, nor was it personal and firsthand, but based upon an assumption of his mother's unusual practices.

Defendant, however, maintains that his involvement also extended to an *offer* to help his brother seek revenge on the victim. Defendant's statement to investigators was that immediately after his brother told him about being beaten, defendant asked if he wanted to return and "get those guys." His brother's response, however, as reported by defendant, that he would take care of it himself, strongly negates the inference that defendant's involvement rose to more than a mere query.

■■■ Even with respect to defendant's statements that he was aware of a motive for the killing, and that he had talked with "Pretty Boy" after Eugene Cooper was beaten to learn what had happened, or his statements that allegedly seemed to show firsthand knowledge of the beating, we are not convinced that such statements are incriminating or could be considered links in a chain of already existent evidence. Solicitation of murder requires that a person either *"commands, encourages* or *requests* another to commit that offense." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 8—1(a).) Conspiracy requires that a person agrees with another and acts in furtherance of the agreement. (Ill. Rev. Stat. 1985, ch. 38, par. 8—2(a).) Defendant's awareness of the motive behind the killing and his query regarding what his brother wanted to do in response do not translate into the affirmative act of either a command or a request, and neither do they indicate encouragement. Furthermore, without the existence of other evidence conceivably in a chain tending to support such charges, defendant's knowledge and question cannot constitute any "link" or "linkage." See *United States v. Chalan*, 812 F.2d at 1309; *People v. Burkert*, 7 Ill. 2d at 515.

Defendant claims that such a chain of evidence was beginning to be assembled by the State because he claimed that, several weeks before trial, prosecutors led him to believe that his brother and mother were prepared to implicate him in the murder. Aside from defendant's

claim, however, the record reflects no indication that such a chain was being assembled.

Defendant also claims that the testimony the State sought to solicit would have tended to incriminate him with respect to perjury, obstruction of justice, or the unlawful possession of weapons. Ill. Rev. Stat. 1987, ch. 38, par. 24—1.1(a).

In *United States v. Fountain* (7th Cir. 1988), 840 F.2d 509, 516, relied upon by defendant, a witness testified against the accused. The witness later recanted the testimony in a statement to the FBI. Later, he recanted the recantation. Then the witness wrote a letter to defense counsel reiterating the recantation, but he refused to swear by it. Finally, the witness wrote a letter to the United States Attorney disavowing the recantation and asserting that he recanted only because he was afraid of retaliation. The court held that extension of the fifth amendment privilege was proper because of the witness' exposure to charges of perjury arising from his waffling positions. The so-called inconsistency of defendant's two positions in the present case does not compare to the defendant's "waffling" in *Fountain*.

■ Defendant gave essentially the same consistent version of events to police officers, detectives, assistant State's Attorney's and the grand jury. These statements later claimed to be "lies," during the tape-recorded interview with his brother's defense counsel, resulted in the discovery of the murder weapon and the uncovering of a motive for the killing. Indeed, the State relied upon the truth of these statements in building its case against Eugene Cooper. It is the defendant, rather than the State, that views the defendant's statements to the authorities and under oath as "lies" and urges the view that he is therefore susceptible to charges of perjury and obstruction of justice. However, defendant should not be able to cloak himself in the fifth amendment privilege on the basis that he fears prosecution for having "lied" when he, himself, by means of a blanket, flat-footed denial converts that prior, consistent, substantiated testimony into "lies." This is particularly so where the possible motivation for such a denial is so nicely served by the assertion of the privilege.

■ Neither is defendant's fear of prosecution for the unlawful possession of a weapon well founded. (Ill. Rev. Stat. 1985, ch. 38, par. 24—1.1(a).) Defendant cannot reasonably believe that merely his statement that his mother gave him a gun for protection which he returned in a few days because he was afraid since he was a convicted felon exposed him to prosecution. We are mindful that the trial judge in appraising the claim of privilege must be governed as much by his personal perception of the peculiarities of the case as by the facts ac-

tually in evidence. *United States v. Chalan*, 812 F.2d at 1310.

█ █ Yet, as further support of his claim of a valid privilege, defendant contends that if he had answered the State's direct examination, he would have exposed himself to self-incrimination during the defense's broad-ranging cross-examination. A witness cannot assert the fifth amendment privilege with respect to specific questions if they are within the scope of previous testimony; he cannot deprive the opposing party of the right of cross-examination. (*United States v. Herrera-Medina* (7th Cir. 1988), 853 F.2d 564, 567.) However, we fail to see how defendant's answers to cross-examination would have exposed him to any broader threat of self-incrimination than that posed by the State's direct examination. The information that defense counsel requested about defendant's general knowledge and experience with guns did not necessarily provide a "link" to the crime here, nor did it tend to incriminate him. Defendant is a felon previously convicted and sentenced for a crime involving a gun. Even in conjunction with the evidence the State already attempted to adduce by direct examination, defendant's anticipated response to this line of questioning is not so strongly adverse as to constitute a "link."

Accordingly, we affirm the judgment of the circuit court which found defendant in direct criminal contempt of court.

Affirmed.

La PORTA, P.J., and EGAN, J., concur.