THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DEJUAN BROWN *et al.*, Defendants-Appellees.

First District (3rd Division) Nos. 1—86—3509, 1—86—3510 cons.

Opinion filed May 10, 1989.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Linda Woloshin, and Pamela Hughes, Assistant State's Attorneys, of counsel), for the People.

Randolph N. Stone, Public Defender, of Chicago (Paul D. Bellendir and Ronald P. Alwin, Assistant Public Defenders, of counsel), for appellee DeJuan Brown.

Richard T. Cozzola, of Cabrini Green Legal Aid Clinic, of Chicago, for appellee David Lowe.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Defendants, DeJuan Brown (Brown) and David Lowe (Lowe), were indicted for murder and armed violence in the circuit court of Cook County in connection with the death of Richard Barners on December 22, 1985. Prior to trial, Brown filed a motion to suppress statements and Lowe filed a motion to quash arrest and suppress statements. After an evidentiary hearing, the trial court granted both motions. The State appeals under Supreme Court Rule 604(a)(1) (107 Ill. 2d R. 604(a)(1)).

Chicago police officers John McHugh and James Ward arrested

Brown, a 16-year-old at the time, between 11 a.m. and 12 on December 23, 1985, for an unrelated battery. The officers took him to the police station at the housing project where he lived. Shortly after his arrival there, Brown was transported to the Chicago Avenue station and delivered to the custody of a youth officer. The police at Chicago Avenue called Brown's grandmother, informed her of his arrest and requested that she send someone to pick him up. While Brown was at Chicago Avenue, two detectives came to him and told him, "Snooky and Lowdown said you did this murder," apparently referring to the murder of Richard Barners. Brown told the officers he did not know what they were talking about. Eventually, Brown was transferred to Area 6 headquarters at Belmont and Western. He arrived there sometime between noon and 5 p.m.

At about 5 p.m., Officers McHugh and Ward interrogated Brown at Area 6 regarding Barners' murder. During this interrogation, according to the police, Brown implicated Lowe in Barners' murder. McHugh, Ward and Area 6 detective Dennis Gray interrogated Brown again approximately half an hour later. Brown was interrogated by an assistant State's Attorney between 8 and 8:30 p.m. Thereafter, Brown's mother, who had arrived at Area 6 sometime earlier, was allowed to see him. After speaking with his mother, Brown declined to give a written statement.

The main issues raised by Brown's motion to suppress and the evidence adduced thereon were: (1) whether he was advised of his *Miranda* rights, that he could be tried as an adult, or that he could have a parent, interested adult or youth officer present during questioning; (2) whether he asked to see his mother and, if so, whether the police told him he could not do so; (3) whether he was otherwise mentally or psychologically coerced or scared into giving a statement; and (4) whether his mother was misled as to his whereabouts on the afternoon of his arrest to prevent her from being present during his questioning.

On the morning of December 28, 1985, McHugh and Ward attempted to interview Lowe, also a 16-year-old at the time, regarding Barners' murder. They wanted to interview him because Brown had said that Lowe "was the individual with him who had knocked on the door," apparently, when Barners was shot. When they found that Lowe was not home, the officers informed his mother that he might be a witness to a murder or involved in it and that they wanted to speak to him. The officers interviewed Lowe at his apartment on the afternoon of December 28. Sometime after the interview, the officers searched an apartment at 1157 Cleveland for the gun used in

Barners' murder. After recovering a revolver from the apartment, the officers met with Lowe and his uncle, James Wright, "on the street" and Lowe identified the revolver as the weapon used in Barners' murder.

McHugh and Ward next saw Lowe and his uncle at about 7:30 p.m. that day. The officers had either called Lowe's uncle and asked him to bring Lowe to Chicago and Orleans or had made prior arrangements with Lowe to meet them there. At any rate, the officers asked Lowe to get out of Wright's car and told him that he "would have to" go with them to Area 6 for questioning. The police, who had not received any new information since speaking with Lowe earlier in the day, wanted to question him because they did not know whether he was only a witness to Barners' murder or was actually involved in it. Wright told the officers he would be at Area 6 after picking up his girlfriend. Wright did not see Lowe again on December 28 although he did go to Area 6 and stayed there 60 to 90 minutes. Lowe gave an assistant State's Attorney an oral statement at about 10:15 p.m. He gave a written statement around 12. Later on the morning of December 29, the police called Lowe's mother and informed her he had been charged with murder.

The main issues raised by Lowe's motion to quash arrest and to suppress his statements and the evidence adduced thereon were: (1) whether he had been under arrest when he went to Area 6 with McHugh and Ward; (2) if he had, whether they had probable cause to arrest him at that time; (3) whether he was advised of his *Miranda* rights, that he could be tried as an adult or that he could have a parent, interested adult, or youth officer present during questioning; (4) whether he was beaten or otherwise mentally or psychologically coerced into making a statement; (5) whether he had asked to see his mother or his uncle during his interrogations and, if so, whether the police had told him he could not do so; and (6) whether James Wright had asked to see Lowe upon his arrival to Area 6 and, if he had, whether the police improperly prohibited him from doing so.

TRIAL COURT'S FINDINGS AND CONCLUSIONS

The trial court's findings and conclusions in ruling upon both motions included the following.

It was undisputed that, after Brown arrived at Area 6 from Chicago Avenue at 1 p.m., he remained alone in an interview room for approximately four hours. Brown's mother called Area 6 at 5 p.m. and was told he was being questioned about a murder. Upon her arrival at the violent crimes office of Area 6, she was told Brown was

still at Chicago Avenue. Chicago Avenue correctly told her Brown was at Area 6 when she inquired there. She returned to Area 6 a second time and was told to wait. The record was clear that Brown's mother "was literally put on a merry-go-round" when she was attempting to locate him. "All of the time she was being shunted between [Chicago Avenue] and Area 6," Brown was being questioned. Based on the totality of the circumstances, Brown's statement had been involuntary.

Lowe had been arrested when he was placed in the police car at the gas station. When he was interviewed at his apartment, he had denied knowledge of or involvement in Barners' murder. The police ignored Lowe's mother's request to be called if they wanted to talk to him further. The officers made no effort to contact his mother or to notify a youth officer. The police made an elaborate effort "to maneuver" Lowe "into a street location *** to clean up their arrest and their subsequent actions of isolating him from adult members of his family until they had secured the admissions they sought." The police also flagrantly violated section 3—2 of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 703—2), requiring an officer who takes a juvenile into custody to make a reasonable attempt to notify a parent, and police department regulations concerning the interrogation of juveniles. It was thus patently clear that they "went far beyond prescribed limits in their efforts to secure a statement" from Lowe. From the totality of the circumstances, Lowe's arrest was illegal and all of his statements thereafter were involuntary.

OPINION

On appeal, the State contends that Brown's statements were voluntary where: (1) he confessed after his mother and a youth officer had been notified; (2) he was at Area 6 for only an hour before he confessed; and (3) he was not threatened or coerced in any way into making a statement. In asserting that the trial court erred in granting Brown's motion, the State focuses on the allegedly erroneous finding that his mother was being "shunted" between Area 6 and Chicago Avenue.

A reviewing court cannot disturb a trial court's ruling on a motion to suppress a defendant's statement or confession unless it is against the manifest weight of the evidence (*People v. Davis* (1983), 97 Ill. 2d 1, 20, 452 N.E.2d 525; *People v. Wipfler* (1977), 68 Ill. 2d 158, 172-73, 368 N.E.2d 870) or manifestly erroneous (*People v. Winters* (1983), 97 Ill. 2d 151, 158, 454 N.E.2d 299). Questions of credibility are to be resolved by the trial court. (*Davis*, 97 Ill. 2d 1, 452 N.E.2d 525; *People v. Hagar* (1987), 160 Ill. App. 3d 370, 373, 513

N.E.2d 628.) Moreover, the correctness of the trial court's ruling, not its rationale, is controlling. (*People v. Dyer* (1986), 141 Ill. App. 3d 326, 490 N.E.2d 237.) The key inquiry in determining the admissibility of a confession is whether it was made freely and voluntarily, without compulsion or inducement of any sort or whether the defendant's will was overcome when he confessed. (*People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33.) Voluntariness is to be determined from the totality of the circumstances. (*People v. Travis* (1984), 122 Ill. App. 3d 671, 462 N.E.2d 654.) Finally, receipt of an incriminating statement from a juvenile is a sensitive concern and the greatest care must be taken to ensure that it is voluntary. *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33.

■ Even assuming the truth of the State's asserted grounds for a finding that Brown's statements were voluntary and that his mother was not "shunted" around to prevent her presence during his interrogations, we cannot reverse the trial court's ruling on Brown's motion. A reversal of the court's ruling would *also* have to be based on the conclusion, either explicit or implicit, that the manifest weight of the evidence revealed that defendant was advised of his *Miranda* rights and knowingly and intelligently waived them. However, the manifest weight of the evidence does not reveal that to be the case.

At the suppression hearing on December 23, 1985, Brown consistently denied that he was ever advised of his rights, including his *Miranda* rights. The State's witnesses contended the opposite. However, this merely rendered the evidence on this issue in equilibrium. In this regard, the facts that more witnesses claimed that Brown had been advised of his rights than claimed he had not and that the State's witnesses were police officers and a former assistant State's Attorney were of no consequence. Obviously, such facts do not and cannot, alone, justify according more weight to the State's evidence than to a defendant's evidence.

In reaching our conclusion, we also rely on the undisputed fact that neither the police officers nor assistant State's Attorney who interrogated Brown obtained his signature on a rights waiver form. Surely, it must be apparent to law enforcement officers that a defendant's signature on such a form would be of great value in refuting a later claim that he had not knowingly and intelligently waived his *Miranda* rights before making an inculpatory statement.

■ By the same token, the failure to obtain a defendant's signature on such a form carries great weight in support of that allegation. In this regard, we note that the State's witnesses did not assert that, although he agreed to waive his rights, Brown simply refused to sign

a rights waiver form. Rather, they admitted that they did not even ask him to do so. While the former circumstance diminishes the importance of not obtaining a defendant's signature on such a form, the latter circumstance magnifies its importance. Where a defendant later alleges a statement was involuntary and the State alleges the contrary, the fact that the police did not even ask him to sign such a form justifies an inference that they did not ask because they had not advised him of his rights or because he had not, contrary to the State's assertion, agreed to waive his rights.

In view of Brown's denial that he had been advised of his *Miranda* rights and the fact that he did not sign a rights waiver form, the manifest weight of the evidence does not reveal that he knowingly and intelligently waived those rights. We must therefore affirm the grant of Brown's motion to suppress.

■ The evidence with regard to whether Brown had asked to see his mother was also conflicting. As such, we cannot say that the manifest weight of the evidence reveals that Brown had not asked to see her. Neither does the manifest weight of the evidence reveal that Brown's mother was allowed to see him as soon as it was reasonably practicable to do so. In relying upon this fact, we recognize that a juvenile does not have a *per se* right in Illinois to consult with a parent before questioning or to have the parent present during questioning. (*In re S.D.S.* (1982), 103 Ill. App. 3d 1008, 1012, 431 N.E.2d 759, *cert. denied* (1982), 459 U.S. 869, 74 L. Ed. 2d 128, 103 S. Ct. 153.) However, where they indicate an interest by their presence, parents should be allowed to confer with their child before, and to be present during, any questioning. The presence or absence of the parent is a factor in evaluating the voluntariness of a statement or confession under the totality of the circumstances test. *In re S.D.S.*, 103 Ill. App. 3d 1008, 431 N.E.2d 759.

■ Brown's mother testified that she arrived at Area 6 late in the evening, around 7 o'clock on December 23. It is a reasonable inference from the testimony of the State's witnesses that they were not aware of her presence at Area 6 until they ended their interrogation of Brown at about 8:30 p.m. However, the fact that the assistant State's Attorney and police officers who were questioning Brown did not know of his mother's presence at Area 6 is insufficient to avoid the obligation to allow a parent to see his or her child where, as here, the parent has indicated an interest by her presence at the police station. Under such circumstances, the officers who know of the parent's presence have an affirmative duty to inform those actually questioning a juvenile of the parent's presence and request to see her child.

And, in order to ensure the true voluntariness of a statement, those actually questioning the juvenile have an affirmative duty to stop the questioning and allow the parent to confer with her child. Where, as here, one or both of these duties is not fulfilled, that fact is properly considered in evaluating the voluntariness of a statement or confession.

▮ Under the totality of the circumstances surrounding the custodial interrogations of Brown, we believe the trial court's grant of his motion to suppress was not against the manifest weight of the evidence.

The State next contends that the police had probable cause to arrest Lowe and that his statement was voluntary under all the facts and circumstances of his interrogation thereafter.

Even assuming, as the State asserts, that Lowe's arrest was legal, *i.e.*, accompanied by probable cause, and that we would therefore reverse the trial court's ruling on his motion to quash arrest, we cannot reverse the trial court's ruling on his motion to suppress unless we also find that the manifest weight of the evidence reveals that his statements were otherwise voluntary. However, as with Brown's statements, we do not find this to be the case.

At the suppression hearing, Lowe consistently denied having been advised of his *Miranda* rights after his arrest up to the time of his written statement. He also claimed that he asked about his uncle's whereabouts but received no answer from the police and that his request to call his mother was denied. Lowe further claimed that he was beaten and threatened into making a statement to the police and assistant State's Attorney and that the police directed his answers to the attorney's questions.

▮ The State's witnesses contradicted Lowe's testimony in all of these respects. Moreover, Lowe's written statement reflected that he was not made any promises or threatened in exchange for the statement. Additionally, Lowe admitted being advised, at the time of his written statement, of his *Miranda* rights and that he could have his mother present during questioning. However, the effect of this latter fact is diminished by his testimony that he did not understand those rights and by the failure of the written statement to reflect that he was informed he could have his mother present during interrogation. In the final analysis, the contradictions in the evidence on these matters preclude a finding that the trial court's ruling on Lowe's motion to suppress was against the manifest weight of all the evidence.

▮ We find that the failure of the police to allow Lowe's uncle to see him and to be present during his questioning, although he had

indicated an interest by his presence at Area 6, also rendered Lowe's statements involuntary. In this regard, we believe that, while there is no *per se* right to speak to an adult in all cases, whether a juvenile has been afforded an opportunity to speak with an interested adult *who is available to do so* is of great importance in later determining the voluntariness of any statements by the juvenile.

For all of the foregoing reasons, the order granting defendants' motions to suppress are affirmed.

Affirmed.

RIZZI and WHITE, JJ., concur.