FIFTH DIVISION
 October 11, 1996






No. 1-95-0183

In re LASHUN H., a Minor ) Appeal from the
 ) Circuit Court of
(The People of the State of Illinois, ) Cook County.
 )
 Petitioner-Appellee, )
 )
 v. )
 )
Lashun H., a Minor, ) Honorable
 ) Maureen Durkin Roy,
 Respondent-Appellant). ) Judge Presiding.

 PRESIDING JUSTICE McNULTY delivered the opinion of the court:

 Respondent Lashun H. was adjudicated delinquent for first-
degree murder and committed to the Department of Corrections.
Respondent claims on appeal that the trial court erred in: (1)
finding that respondent s confession was voluntarily given; (2)
holding that respondent had knowingly and intelligently waived his
privilege against self-incrimination; (3) curtailing his cross-
examination of witnesses during the suppression hearing; (4)
adjudicating first-degree murder when respondent had a valid claim
for self-defense; and (5) adjudicating first-degree murder when
respondent held an unreasonable belief that the use of force in
self-defense was justified. We reverse and remand.
 On March 12, 1994, the decedent, Antoine Brown, was playing
with a group of about 20 boys at 5119 West Adams in Chicago. 
Respondent, Ralph Anderson and two other boys approached decedent
and the other boys. A confrontation ensued in which the decedent
was killed by a gunshot wound in the back. Respondent and Anderson
were arrested, charged and tried for the shooting. Respondent was
14 years old at the time of the incident. 
 Before the adjudicatory hearing, respondent sought to suppress
a statement given by him to police the day after the shooting. In
the suppression hearing, Officer Luis Bergos testified that he went
to respondent s home on the day of the shooting and asked
respondent s mother, Brenda, about respondent's whereabouts. 
Officer Bergos left a number where he could be reached. Brenda
later testified that Officer Bergos told her that the police would
shoot respondent if they found him with his hands in his pockets,
but Officer Bergos denied making that statement.
 Officer Mike Walter testified that Brenda called him and told
him that her son was at the house of Calvin Hudson, his uncle. 
Officer Walter drove to Brenda s home and she accompanied him to
Hudson s home. According to Officer Walter, respondent was awake
and in the dining room when they arrived. Officer Walter informed
respondent of his Miranda rights, asked respondent whether he
understood each of his rights and asked respondent if he wished to
talk to the police. Respondent indicated that he understood his
rights and would cooperate with the police. Officer Walter found
respondent to be coherent. Officer Walter asked respondent where
the gun used in the shooting was and respondent said that he gave it
to his friend Terrell Wyatt so that Wyatt could hide it. Officer
Walter then took respondent and his mother to Terrell Wyatt s house. 
Terrell was not home, but his mother knew where he might be. 
Terrell s mother led them to a house a block away, where they
recovered the gun. Officer Walter and other officers then took
respondent and his mother to the 15th District police station. 
Officer Walter was then asked by Detective Dolan to bring all
witnesses to the incident to Area Five police headquarters. 
 When they arrived at Area Five, the officers took respondent
upstairs and asked Brenda to wait downstairs. Officer Walter
testified that respondent s mother did not ask to go upstairs and
respondent did not ask to have his mother come upstairs. 
 Respondent s uncle, Calvin Hudson, testified that respondent
fell asleep at his house on the night of the shooting. Hudson
testified that police came to his house with their guns drawn and
went to the bedroom to wake respondent. The officers then picked
respondent up, searched him, took him into the dining room and
handcuffed him. The officers asked respondent about a shooting and
a gun and then put him in a squad car. Hudson went with respondent
in a police car to the 15th District police station, while Brenda
went to the station in a different police car. Hudson testified
that one of the officers in the car said something like, "You should
not have shot this boy," and respondent stated that he did not shoot
the boy. Hudson also heard an officer say they recovered a gun. At
the 15th District police station, Brenda asked the officers when
she could see respondent. An officer told Brenda she could see her
son in 5 or 10 minutes, but for the entire time they remained at the
15th District station, she was not allowed to see her son.
 Police officers then drove respondent, Hudson and Brenda in the
back seat of a squad car to the Area Five police station. When they
arrived at the Area Five police station, respondent was taken
upstairs and Hudson and Brenda were told to wait in a waiting room. 
Hudson remained at the station until 4 a.m., during which time
Brenda asked two or three times whether she could see respondent,
but was refused.
 Respondent s mother, Brenda Henry, testified that on the day of
the shooting, Officer Bergos came to her house looking for
respondent and informed her that if the officers "caught
[respondent] with his hands in his pocket[s] they were going to
shoot him." When Brenda learned that respondent was at Calvin
Hudson s house, she informed the police and the police came to her
house and took her to Hudson s house. Four officers entered
Hudson s house with their guns drawn, went to the bedroom, woke
respondent up, took him to the dining room, handcuffed him and asked
him where the gun was. The police denied that they awakened
respondent. Shortly before midnight, the police drove her in one
car and respondent in another to Terrell Wyatt s house, where they
recovered a gun. The police then took them to the Chicago Avenue
police station and put Brenda in a waiting room. Although Brenda
asked to see respondent, she did not see him until 3 a.m. when the
officers drove her and Calvin Hudson in a police car with respondent
to the Area Five police station. Upon arrival at the station,
respondent and Brenda were separated. Brenda asked five times
whether she could see respondent, but was refused. At one point,
she went upstairs in an attempt to see respondent, but was sent back
downstairs. When she finally saw respondent sometime after 6 a.m.,
he had his head down and tears in his eyes. Respondent told her
that he was not the shooter.
 Youth Officer Pulius testified that he was assigned to assist
respondent in his questioning by Detective Dolan. Officer Pulius
met with respondent at the Area Five station and gave him his
Miranda warnings and explained to respondent that he was there to
protect his rights. Officer Pulius asked respondent whether he
understood his rights, and respondent stated that he did. Officer
Pulius then warned respondent that he could be tried as an adult and
asked if he understood the gravity of the situation, and respondent
indicated that he did. Respondent then agreed to speak to Officer
Pulius and Detective Dolan. Officer Pulius testified that
respondent declined food on two occasions and respondent received a
drink and went to the washroom. Respondent was a little nervous but
was coherent and answered the detective s questions intelligently. 
Respondent never asked to speak to his parents or an attorney. 
Officer Pulius testified that he asked one of the detectives whether
respondent s parents had been contacted and was told that
respondent s parents had been notified, but were not at the station. 
Officer Pulius never informed respondent that his mother could be
with him during the interview nor did he ask respondent whether he
wanted his parents there. Officer Pulius admitted that the police
guidelines state that a parent, relative or friend should be present
whenever a minor is interviewed.
 Detective John Dolan testified that he interviewed respondent
at Area Five headquarters. Detective Dolan had two conversations
with respondent. Officer Pulius was present during both
conversations. Although Detective Dolan knew that respondent s
mother was at the station and had requested to be present during the
questioning of her son, Detective Dolan would not permit her to be
present during his questioning of respondent. Detective Dolan never
informed respondent that his mother could be present during the
questioning. The first round of questioning began at 3:30 a.m. and
lasted for about 15 minutes. Respondent claimed that Ralph Anderson
was the shooter and that Anderson handed the gun to him. Detective
Dolan then interviewed other witnesses for two hours. When Dolan
returned to respondent at 5:45 a.m., respondent appeared to be
sleeping. However, according to Detective Dolan, respondent
appeared coherent, alert and responsive. Detective Dolan told
respondent that witnesses had implicated him as the shooter. 
However, Detective Dolan did not tell him that other witnesses had
implicated Anderson as the shooter. Detective Dolan told respondent
that one of the witnesses had said respondent had a knife and
respondent admitted that he had a knife in his possession. Shortly
before 6:15 a.m., respondent made an incriminating statement. 
Respondent stated that he and several friends were surrounded by a
larger group, one of whom hit one of his friends. Another
individual took a swing at respondent and missed, at which time
respondent fired a gun, which he had up the right sleeve of his
jacket. Respondent's statement was never reduced to writing or
signed, nor was it taken in the presence of an assistant State s
Attorney. 
 School psychologist Irvine Hassman testified that respondent s
reading and spelling levels were those of a seven-year-old and his
math comprehension was that of a 12-year-old. Respondent met with
a learning disability specialist for 40 minutes each school day. 
Hassman testified that he could not determine whether respondent
could understand Miranda warnings. Hassman read from a report of
respondent s language therapist, who wrote that respondent s
receptive and expressive language as relating to understanding words
was somewhat limited, but his ability to communicate on an everyday
basis with teachers and students was within normal limits for his
age. Respondent received Ds and Fs in school, but Hassman stated
that could have resulted from respondent choosing not to complete
his work. Respondent had not taken an I.Q. test, which would have
given a clearer picture of respondent s cognitive skills. 
 The trial court denied respondent s motion to suppress his
statement, holding that under the totality of the circumstances,
respondent s will was not overborne. The court also determined that
Hassman s testimony did not support a finding that respondent did
not understand his Miranda rights. 
 At the adjudicatory hearing, the State introduced respondent s
statement into evidence. The State also presented witnesses to
testify that they saw respondent shoot the victim and heard
respondent claim that he had shot someone. Respondent attempted to
impeach the State s witnesses and presented evidence to implicate
Anderson as the shooter. The court acquitted Anderson and entered
a finding of delinquency on respondent and sentenced him to the
Department of Corrections. 
 Respondent first claims on appeal that the trial court erred in
finding his confession voluntary and denying his motion to suppress
his confession. The receiving of an incriminating statement made by
a juvenile in the absence of counsel is a sensitive concern
requiring great care to assure that the juvenile s confession was
neither coerced or suggested, nor a product of fright or despair.
People v. Prude, 66 Ill. 2d 470, 363 N.E.2d 371 (1977). The test is
whether, under the totality of the circumstances, the statement was
made freely, without compulsion or inducement, with consideration
given to the characteristics of the accused as well as the details
of the interrogation. People v. Prim, 53 Ill. 2d 62, 289 N.E.2d 601
(1972). Relevant factors in determining whether a confession was
voluntary under the totality of the circumstances include the age,
intelligence, experience and physical condition of the accused, the
length and intensity of the interrogation, and the existence of any
threats, promises, or physical coercion. People v. Martin, 102 Ill.
2d 412, 466 N.E.2d 228 (1984). When a juvenile is involved,
additional factors come into play, such as the time of day and the
presence of a parent or other adult interested in the juvenile s
welfare. People v. Brown, 235 Ill. App. 3d 479, 601 N.E.2d 1190
(1992). A reviewing court will not disturb a finding by the trial
court on the voluntariness of a confession unless the finding is
contrary to the manifest weight of the evidence. People v. Davis,
97 Ill. 2d 1, 452 N.E.2d 525 (1983). 
 We have carefully reviewed all of the circumstances surrounding
respondent s confession and conclude that the trial court s
determination that respondent s confession was voluntary is against
the manifest weight of the evidence. The coercive nature of the 14-
year-old respondent s encounter with the police began immediately
upon respondent s arrest at his uncle s house. The police arrived at
respondent s uncle s home shortly before midnight and entered the
house with guns drawn. Respondent and his mother were taken to the
15th District police station in separate police cars. Upon arrival
at the station, respondent s mother and uncle were taken to a
waiting room and respondent was taken upstairs. Respondent was not
permitted to speak with either his mother or uncle. When respondent
was later transported to Area Five police headquarters, his mother
and uncle were driven in the same police car, but respondent did not
have an opportunity to confer with them since no interrogation
occurred at that time, police officers were in the front seat of the
car and Terrell Wyatt, who had interests antagonistic to respondent,
was seated in the back. Respondent s mother and uncle testified
that respondent's mother made repeated requests while at both
stations to see respondent, but her requests were denied. The
detectives were fully aware of Brenda s presence at the Area Five
police station, since she was taken to the station by police
officers and she made her presence known to officers in the station. 
However, Detective Dolan testified that he would not permit
respondent's mother to be present during his interrogation of
respondent. 
 Detective Dolan questioned respondent for 15 minutes at 3:30
a.m. and respondent denied that he was the shooter. Respondent was
then left alone in the interview room until 5:50 a.m. while the
police conducted further investigation. At 5:50 Detective Dolan
woke respondent up and questioned him for another 25 minutes. While
the detective informed respondent that witnesses had identified him
as the shooter, he never informed respondent that other witnesses
had identified Anderson as the shooter. While Detective Dolan
claimed that respondent confessed at about 6:15 a.m., respondent was
never requested to sign a formal waiver of his rights, this
confession was never reduced to writing and was never given to
respondent to review and sign. Respondent s mother was not allowed
to see him until after he confessed. When respondent saw his
mother, he informed her that he was not the shooter. All of these
factors, combined with respondent s learning disability and minimal
prior contact with the juvenile justice system, lead us to conclude
that respondent s confession was not voluntary.
 Although a juvenile does not have a per se right to consult
with a parent before questioning or to have the parent present
during questioning, the presence or absence of the parent is a
factor in evaluating the voluntariness of a confession under the
totality of the circumstances. People v. Brown, 182 Ill. App. 3d
1046, 1053, 538 N.E.2d 909 (1989). In People v. Montanez, 273 Ill.
App. 3d 844, 652 N.E.2d 1271 (1995), the 15-year-old defendant was
arrested at 9 p.m. and taken to Area Five police headquarters. 
Before either a youth officer or the defendant s mother arrived at
the station, a detective began questioning the defendant. The
detective read the defendant her Miranda warnings, and the defendant
stated that she understood her rights and would make a statement. 
Youth Officer Pulius arrived at 12:30 a.m. after defendant gave her
statement. Pulius was, however, present for defendant s next three
conversations with the detective, which concluded sometime after
6:15 a.m. An assistant State s Attorney spoke with defendant at
1:15 a.m., advised her of her rights and told her that she would be
treated as an adult. After speaking with the assistant State s
Attorney, defendant agreed to make a statement in the presence of a
court reporter. The assistant State s Attorney read the statement
to the defendant and the defendant made corrections to the statement
and then signed it. 
 The defendant s mother testified that at 10 p.m., she learned
that her daughter was in custody, but the detectives told her that
she could not see her daughter at that time but they would notify
her when she could. At 2 a.m., when the defendant s mother still
had not heard from the police, she went to the station. She was
told to wait in a waiting room, but instead went upstairs to find
the defendant. She was told to leave, but went back upstairs every
hour or so in an attempt to see her daughter. She was finally
allowed to see her daughter at 8:30 a.m., after her daughter had
made an incriminating statement. 
 The court reversed the trial court s denial of defendant s
motion to suppress, finding that the defendant s confession was not
voluntary since she was "interrogated throughout the night as part
of a pattern of police conduct designed to elicit a confession, as
well as to obstruct parental counselling." Montanez, 273 Ill. App.
3d at 855. The court found that the mother, who had been present at
the station for over six hours, had demonstrated an interest in her
daughter's welfare. However, the police repeatedly attempted to
question the minor without prior parental counseling, thereby
obstructing the mother s attempts to communicate with her daughter
until after her daughter s confession had been reduced to writing
and signed. Such police conduct is material in determining
voluntariness of a minor defendant s confession. Montanez, 273 Ill.
App. 3d at 852.
 Courts have repeatedly held that police conduct which
frustrates a parent s attempts to confer with her child prior to or
during questioning is significant in determining voluntariness of a
confession. In People v. Knox, 186 Ill. App. 3d 808, 542 N.E.2d 910
(1989), for example, when the defendant was arrested at his home at
9:40 p.m., his father could not accompany him to the station because
he was caring for his young children and defendant's mother was not
home. Defendant s mother arrived at the station at 10:10 p.m. as
soon as she learned of his arrest. She identified herself at the
front desk and was told to wait. At 12 midnight, she was told that
defendant had already confessed and she should go home. At 2:45, an
assistant State s Attorney reduced defendant s statement to writing
and defendant corrected and signed the statement.
 In reversing the denial of defendant s motion to suppress, the
court found that the police had "contributed significantly to
eliminating any opportunity defendant had from speaking to his
mother at the police station." Knox, 186 Ill. App. 3d at 813-14. 
In evaluating the evidence, the court stated:
 "We do not believe such conduct by police is
 consistent with the great care required where a
 juvenile s incriminating statement is received. At
 worst, the police purposefully precluded defendant s
 mother from contact with defendant by neglecting to see
 if defendant s mother had arrived until after such time
 as defendant had completed his confession. At best, the
 police simply subjected defendant to the same routine
 questioning of a criminal suspect without special regard
 for his youth. Either scenario is impermissible and
 casts some doubt over the voluntariness of defendant s
 statement." Knox, 186 Ill. App. 3d at 814.
 Similarly, in In re J.O., 231 Ill. App. 3d 853, 596 N.E.2d
1285 (1992), although the 12-year-old respondent's parents were at
the station, they were not allowed to confer with their son until
after he had confessed. In finding that respondent's statement
had been properly suppressed, the court stated: 
 "A juvenile s age and the fact that the interrogation
 occurred in the middle of the night may properly be
 considered in evaluating the voluntary nature of a
 confession. [Citation.] Additionally, if parents have
 indicated an interest by their presence, then they
 should be allowed to confer with their children before
 any questio+ning begins, as well as be present when any
 questioning occurs." In re J.O., 231 Ill. App. 3d at
 855.
 The court concluded that the presence or absence of a parent is
one factor in evaluating the voluntary nature of a confession
under the totality of the circumstances. 
 In People v. Brown, 182 Ill. App. 3d 1046, 538 N.E.2d 909 
(1989), the court held that the fact that those questioning a
defendant were unaware of the defendant's mother's presence at the
police station was insufficient to avoid the obligation to allow
a parent to see her child where the parent indicated an interest
by her presence at the police station. The court explained:
 "[T]he officers who know of the parent's presence have an
 affirmative duty to inform those actually questioning a
 juvenile of the parent's presence and request to see her
 child. And, in order to ensure the true voluntariness of
 a statement, those questioning the juvenile have an
 affirmative duty to stop the questioning and allow the
 parent to confer with her child." Brown, at 182 Ill.
 App. 3d at 1053-54. 
 The police in the instant case clearly frustrated
respondent's mother s attempts to confer with her son. Respondent
and his mother were taken to the 15th District police station in
separate police cars. Despite her requests, respondent's mother
was not allowed to speak with her son at the station. Although
respondent's mother was transported to Area Five in the same car
as her son, as discussed previously, she had no opportunity to
confer with her son at that time. Once at Area Five, respondent
and his mother were again separated. Although youth officer
Pulius at Area Five claimed he was unaware that respondent's
mother was at the Area Five station, other officers, including
Officer Walter from the 15th District, who transported
respondent's mother to the station, and Detective Dolan who
interrogated respondent, were fully aware of the mother s presence
at the station. When youth officer Pulius asked whether
respondent's parents had been contacted, a detective told him that
respondent's parents had been notified but were not at the
station. This misrepresentation further indicates that the
detectives did not want Officer Pulius to permit respondent's
mother to confer with her son or to be present during the
interrogation but instead attempted to create a coercive
environment and extract a confession from respondent, although the
mother had fully cooperated with the police during their
investigation.
 While Officer Walter could not recall whether respondent or
his mother requested to see one another while at the 15th District
station, respondent's mother and uncle testified that respondent's
mother requested to see her son several times but was refused. 
Furthermore, while Detective Dolan was aware that respondent's
mother requested to be present during her son's questioning, he
testified that he would not permit her to be present during the
interview. At one point, respondent's mother went upstairs in an
attempt to see respondent, but she was sent back downstairs. 
Respondent's mother was not permitted to see her son until after
6 a.m., after he had confessed. Common sense leads us to conclude
that respondent s mother would not have remained at station from
midnight until after 6 a.m., without asking to see her son and
being interested in seeing her son. Her attempts, however, were
clearly frustrated by the police so that they could create an
intimidating atmosphere and obtain a confession. 
 Just as the absence of a parent does not per se make a
confession involuntary, we do not find the presence of a youth
officer per se makes a confession voluntary. See People v.
Gardner, 282 Ill. App. 3d 209, 218 (1996) at p.8, (in some cases
where the defendant is prevented from seeing his parent or
guardian, the presence of the youth officer would not be enough to
demonstrate voluntariness). We instead consider this a
significant factor in determining that respondent s confession was
not voluntary, along with the coercive nature of respondent s
encounter with police, respondent s youth, his learning
disabilities, his lack of experience with the criminal or juvenile
justice system, and the failure of the detectives to contact an
assistant State s Attorney or reduce respondent s statement to
writing. 
 The officers' intimidation of respondent began when they
entered his uncle s house at 11 p.m. with guns drawn. While it is
undisputed that the officers entered the house with their guns
drawn, the dissent claims that there is no evidence that
respondent ever saw a police gun out of its holster since
respondent's mother and uncle testified that respondent was asleep
when the police entered the house. However, Officer Walter
testified that respondent was awake and in the dining room when
the officers entered the house. We must accept the officer's
testimony as true, so as not to substitute our judgment for that
of the trial court on this issue of credibility. People v. Young,
206 Ill. App. 3d 789, 564 N.E.2d 1254 (1990). 
 The intimidation continued as the police took respondent to
one police station and then another, and detectives questioned him
at 3:30 a.m. and again at 5:45 a.m., telling respondent only of
the inculpatory and not exculpatory evidence the detectives had
received from witnesses. If respondent slept at all between his
arrest at around 11 p.m. and his confession at about 6 a.m. the
following morning, it was briefly between the conclusion of the
first interview at 3:45 and the beginning of the second interview
at 5:50 a.m. See People v. McGhee, 154 Ill. App. 3d, 232, 507
N.E.2d 33 (1987) (15-year-old defendant s statement found
involuntary where the defendant was subjected to a lengthy
interrogation, was lacking in sleep, the police failed to properly
notify defendant s parents or a youth officer and failed to permit
defendant s mother to see him at the police station prior to the
time he made an inculpatory statement). The detective's testimony
that respondent appeared coherent during the questioning is not in
itself determinative of the voluntariness of the statement. 
 Respondent was even more vulnerable than an average 14-year-
old since he had learning disabilities, a limited ability to
express and understand words and the reading skills of a seven
year old. Respondent's prior contacts with the police were
minimal and were not of the nature that would have lessened the 
intimidation inherent in this encounter with the police. This was
respondent s first referral to juvenile court. While respondent
had been charged with possession of controlled substance, that
charge was screened out by the assistant State s Attorney after
respondent successfully completed a drug education program. 
Respondent also had a station adjustment, but that is merely a
verbal warning from the police that occurs when the police take a
minor to the police station but release him after deciding not to
refer the matter to juvenile court. People v. D.B., 202 Ill. App.
3d 194, 559 N.E.2d 873 (1990). Thus, neither of these prior
experiences would have given respondent the sophistication or an
understanding of how to conduct himself while being interrogated
by police in a murder case. 
 The voluntariness of respondent s confession in this case is
even more suspect in light of the detectives failure to call the
felony review section of the State s Attorney s office and have an
assistant State s Attorney present during any of the interviews
with respondent. Furthermore, respondent s statement was never
reduced to writing and was therefore never given to respondent to
check for accuracy and for signature. When respondent was finally
permitted to see his mother after giving his confession, he told
her that he was not the shooter. The fact that the detectives
failed to call an assistant State's Attorney, or reduce
respondent's statement to writing leads to the inference that the
police knew respondent's confession was tenuous and were concerned
that they could not get respondent to consistently repeat his
confession. 
 Taking into consideration the totality of the circumstances
surrounding respondent's confession, we find respondent's
confession involuntary. The 14-year-old learning-disabled
respondent, who had minimal previous contact with police, was
brought to the station late at night, after being removed from his
uncle's house at gunpoint. He was interrogated throughout the
early morning hours, separated from his family during the
interrogation period, and gave a confession that was never reduced
to writing. Notwithstanding the presence of a youth officer
during the final interrogation that resulted in the admission,
these other circumstances convince us that the trial court's
decision to deny respondent's motion to suppress was against the
manifest weight of the evidence. 
 In light of our decision to reverse the trial court s order
denying respondent s motion to dismiss and to remand this case for
a new trial, we need only briefly address one other contention
raised by respondent in this appeal. We note that if on remand
the only evidence respondent presents to support his claim of
self-defense is that his group was surrounded and someone took a
swing at him, that evidence alone is insufficient to sustain
respondent s claim that he feared imminent death or great bodily
harm. 
 Accordingly, for the reasons set forth above, the trial court
order denying respondent's motion to suppress is reversed and this
cause is remanded for a new trial.
 Reversed and remanded. 
 HOURIHANE, J., concurs.
 COUSINS, J., dissents.