THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES GOSSITT, Defendant-Appellant.

First District (4th Division)   No. 1—92—1725

Opinion filed March 3, 1994.

Rita A. Fry, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kathleen Bom, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, defendant, Charles Gossitt, was convicted of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)), and sentenced to a 25-year term in the Illinois Department of Corrections.

On appeal, defendant contends (1) he was denied due process as the evidence presented against him was coerced in violation of the fifth amendment; (2) the testimony and comments relating to his gang membership were improper as such membership bore no relationship to the crime charged; (3) the State's failure to substantiate its inquiries of a witness denied him due process; (4) the trial court displayed hostility toward defense counsel; and (5) the State was allowed to impeach him with prior statements which were not materially inconsistent with his testimony at trial.

We affirm.

The following pertinent facts were adduced at trial. On April 30, 1991, defendant, a member of the Four Corner Hustlers street gang (hereinafter the Hustlers), was involved in a fistfight over an earring with Duke, a member of the Gangster Disciples street gang (hereinafter the Disciples). Later that day, Fred Taylor, a member of the Disciples, went to the home of Horatio, a member of the Hustlers, because a car he purchased from Horatio was "tagged wrong." Horatio told Taylor to return that night and he would give him another car.

At about 9 p.m., a group of 40 to 50 Disciples, including Patrick Doyle, Michael Wilburn and Cheerio, went to the area of 93rd and Harper Streets in Chicago to retaliate against defendant for his previous fight with Duke. The group was unable to find defendant and most of it dispersed with the exception of Doyle, Wilburn and Cheerio.

Wilburn and Cheerio encountered several older members of the Hustlers and engaged them in a fistfight. After a few minutes of fighting, Doyle, Wilburn and Cheerio went to a liquor store to buy some beer. They then went to 93rd and Paxton Streets, where they talked and drank the beer.

As they talked, Doyle and Wilburn saw Fred Taylor driving down the street, flagged him down and got in the car with him. As Taylor drove toward Horatio's house to return the car, Wilburn saw a group of boys in the alley behind defendant's house. The group included defendant, Horatio and Alexis Walker. As they drove by, defendant and Horatio pointed at the car.

When the car approached 93rd and Blackstone Streets, a shot was fired and Taylor slumped over the steering wheel. Three or four

more shots were fired, and Doyle reached over to the driver's side of the car and pressed the accelerator with his hand while Wilburn steered. They drove to 93rd Street and Stony Island Avenue and realized that Taylor had been shot in the left side of the head. The police were summoned and Taylor was taken to Christ Hospital, where he later died.

On May 2, 1991, Steve McDonald, a member of defendant's gang, was interviewed by Assistant State's Attorney Daniel Lynch. McDonald stated that as he stood outside his home on the night of April 30, 1991, his brother told him that someone had been shot. Defendant then approached McDonald and his brother and they asked him what had happened. Defendant responded: "I tried to blow their heads off."

Several days later Alexis Walker, another member of defendant's gang, testified before the grand jury. On the night in question, Walker stated that he was standing in an alley with Alphonso Payne and Steve and Tony McDonald near 93rd and Blackstone Streets. They saw Fred Taylor's car go by and Payne asked defendant if he had "it." Defendant then passed a small black gun to Payne, who passed it back to defendant. The group began to run. As they ran, Walker heard three shots.

Walker testified that, about 20 minutes later, defendant stated he thought he shot Taylor in the head. Defendant explained to Walker that he shot toward the front of the car "so the bullet [would] catch up with the car."

At the conclusion of trial, defendant was convicted of first degree murder and sentenced to 25 years in the Illinois Department of Corrections. He appeals.

Initially, defendant opines that the trial court improperly forced two witnesses to testify after ruling that they could not invoke the fifth amendment privilege against self-incrimination. Defendant contends that his conviction should be reversed as Steve McDonald and Alexis Walker should have been able to invoke the privilege at trial because their prior testimony was coerced and because they feared they would perjure themselves if they testified truthfully.

Detective Michael O'Connor testified that a few days after the killing he went to the home of Alexis Walker to ask him questions about the crime. Walker, however, was not at home and the detective left his business card and requested that Walker telephone him. Walker later contacted the detective and was brought to the police station for questioning. Detective O'Connor stated that Walker was never charged with a crime, was never in custody, and was never threatened.

Assistant State's Attorney Paul Sabin testified that he presented

Walker to the grand jury. Sabin read Walker's grand jury testimony into the record. This testimony demonstrated that defendant told Walker he saw the victim driving his car down the street and that he "shot in front of the car so the bullet [would] catch up with the car." At no time did Walker decline to talk to Sabin or to appear before the grand jury. Further, Walker never told Sabin of any threats or mistreatment by police.

At trial, Alexis Walker attempted to assert his fifth amendment privilege against self-incrimination explaining that he lied to the grand jury because the police threatened to incarcerate him. He feared that his truthful testimony at trial would expose him to a perjury charge and he took the fifth amendment. After hearing both sides, the trial judge ruled that Walker did not have a valid fifth amendment privilege to invoke because his testimony was not incriminating. Walker later testified and specifically denied the information he told the police, the assistant State's Attorney and the grand jury which implicated defendant in the killing.

Assistant State's Attorney Lynch read Steve McDonald's grand jury testimony into the record. This testimony established that while McDonald stood outside his home on the night of the killing, he had a conversation with defendant. Observing an ambulance and policemen in the area, McDonald asked defendant what had happened and defendant replied: "I tried to blow their heads off."

Lynch also identified McDonald's statement to the police as the one McDonald acknowledged as his at the grand jury hearing. This statement contained the same facts as elicited in McDonald's grand jury testimony.

After the trial court ruled that McDonald did not have a valid fifth amendment privilege, he testified and denied all of the statements he made incriminating defendant. He explained that he was forced to lie to both the police and the grand jury because the police threatened to charge him as an accessory to murder.

Presently, defendant attempts to dismiss all of the above consistent prior sworn statements provided by these two witnesses, contending that they are coerced lies. Defendant further argues that a witness' fear of perjury is a valid basis for the invocation of the fifth amendment privilege.

This court has formerly addressed this issue within the context of a defendant's claim at trial that his prior statements to police, an assistant State's Attorney and the grand jury were all untrue, finding:

> "[A] defendant should not be able to cloak himself in the fifth amendment privilege on the basis that he fears prosecution for having 'lied' when he, himself, by means of a blanket, flat-footed

denial converts that prior, consistent, substantiated testimony into 'lies.' This is particularly so where the possible motivation for such a denial is so nicely served by the assertion of the [fifth amendment] privilege." *People v. Cooper* (1990), 202 Ill. App. 3d 336, 344.

■ Walker and McDonald both recounted their stories three times. They spoke to the police, the assistant State's Attorney and the grand jury. The information they provided, of their own volition, was consistent with the police investigation into the killing. We believe *Cooper* is applicable to this case and find that Walker's and McDonald's claims that they "lied," effectively repudiating the congruous, corroborated statements they previously told police, the assistant State's Attorney and the grand jury, cannot be negated by asserting the fifth amendment protection.

Next, defendant maintains that his gang membership was improperly introduced into evidence as the State failed to show that this membership was related to the crime for which he was on trial. We disagree.

Evidence of gang membership is admissible if it is relevant to the issues in the case. (*People v. Hairston* (1970), 46 Ill. 2d 348.) If the evidence is relevant, it is admissible despite prejudice to a defendant resulting from the disclosure. (*People v. Deacon* (1985), 130 Ill. App. 3d 280.) Generally, evidence concerning a defendant's gang affiliation is admissible to show a common purpose or design or to provide a motive for an otherwise inexplicable act. *Hairston*, 46 Ill. 2d at 372.

The evidence adduced at trial indicated that on the afternoon prior to the victim's murder, defendant, a member of the Hustlers, fought with a member of a rival gang, the Disciples. One of the Disciples felt that the fight was unfair and enlisted the help of other members of the gang to return to the area of the fight.

That evening, 40 to 50 members of the Disciples returned to the area looking for defendant but were unable to find him. Several members of this group of Disciples then fought with some older members of the Hustlers. Shortly thereafter, defendant and other members of the Hustlers saw the victim and two Disciples driving down the street in the area where defendant lived. As the victim drove down the street, defendant ran after the car and shot and killed him.

■ Absent the foregoing evidence of gang rivalry and the evidence of the circumstances preceding the killing, specifically, the Disciples' intention to retaliate against defendant, there would have been no explanation or motive for the killing. We conclude that this evidence was accordingly relevant to the charges filed and was properly admitted by the trial court.

Next, defendant argues that the State improperly failed to perfect the impeachment of a witness. On direct examination, Jacqueline Whatley, who resides on Harper Street near the area of the killing, stated that she saw defendant running on the night of April 30, 1991. The following colloquy then occurred:

"Q. Can you describe whether or not you saw anything in Charles Goss[it]t's hand at that time?

A. I saw something shiny. I don't really know. I don't really know what he could have had or anything. All I saw was— I don't know what it was.

\* \* \*

Q. Do you remember talking to Area Two detectives shortly after you saw Charles Goss[it]t running?

A. Yes, I did.

Q. And you talked to them?

A. Yes, I did.

\* \* \*

Q. And do you remember telling those detectives that you could not be 100 percent sure if it was a gun but by the way Goss[it]t was holding his arm, the color, shape, and size of the object you believed it was, in fact, a gun \*\*\*[?]

A. No I don't exactly remember telling them that. I exactly remember telling them that I don't exactly know what it was. That is what I remember telling them."

Regarding this issue, defendant submits that, after eliciting testimony from Whatley about her observance of a shiny object in defendant's hand, the State subsequently and erroneously failed to ask her opinion as to the object's identity. Defendant bases his claim of error on this failure to lay a foundation for impeachment.

■ Defendant, however, does not demonstrate how this isolated question prejudiced him. The State's brief questioning of Whatley with respect to her previous statements to police and her reply that she "did not exactly remember" telling police that she saw defendant with a gun did not prejudice him as there was additional evidence which established that defendant had a gun shortly before the killing.

Alexis Walker told the grand jury that, as the victim's car went by, defendant was holding a small black gun and began to run in the direction of the car. About 10 to 15 seconds after defendant obtained the gun, Walker heard three gunshots and approximately 20 minutes later, defendant told Walker that he "shot Fred in the head." Further, when asked about the gun, defendant told the police they would never find it.

Next, defendant maintains that the trial court improperly showed hostility toward defense counsel in front of the jury.

Although the trial court has wide latitude in the conduct of the trial, it must not introduce comments or opinions tending to support or prejudice one side or the other. (*People v. Velasco* (1989), 184 Ill. App. 3d 618, 640.) "Improper comments include those which reflect disbelief in the testimony of defense witnesses, confidence in the credibility of the prosecution witnesses or an assumption of defendant's guilt. In addition, a hostile attitude toward defense counsel or remarks that defense counsel has presented his case in an improper manner may also be prejudicial and erroneous." *People v. Williams* (1991), 209 Ill. App. 3d 709, 718.

Improper comments may also be harmless error. Defendant must therefore show that the complained-of remarks prejudiced him. "Where it appears that the comments do not constitute a material factor in the conviction, or that prejudice to the defendant is not the probable result, the verdict will not be disturbed." (*Williams*, 209 Ill. App. 3d at 718-19.) We will accordingly examine the remarks in the context in which they were made in view of the evidence presented and the surrounding circumstances.

Defendant first alleges error in the trial court's comments during the cross-examination of Patrick Doyle. When defense counsel attempted to impeach Doyle with a police report, the trial court stated: "[L]et me give you a clue. There is no way you are going to impeach him with what is contained in some police report, not here, not in this courtroom. So go ahead, pose another question."

The second set of remarks occurred during the cross-examination of Steve McDonald. The prosecutor asked McDonald if he had been threatened between May 2, 1991, and May 8, 1991, and the following exchange took place:

"A. May 8th they did.

Q. Sir, did anyone threaten you between May 2nd and May 8th?

[DEFENSE COUNSEL]: He answered, your Honor. He said he was threatened on May 8th.

THE COURT: Well—

[DEFENSE COUNSEL]: That's common parlance.

THE COURT: Is there anything else? Do you want to testify up here Mr. Cohn?

[DEFENSE COUNSEL]: No, your Honor.

THE COURT: Good. Thank you very much. Pose another question."

The third set of comments occurred when defense counsel stated that one of the State's witnesses had given a conflicting answer and the trial court agreed, remarking: "He's doing a lot of that."

The fourth group of comments occurred during defense counsel's

cross-examination of assistant State's Attorney Paul Sabin. Sabin stated that, after two police officers brought defendant into his office, he saw the officers go into another office. Defense counsel then said: "Well, you say you saw them in another office, correct?" The trial court then clarified: "That is not what he said."

The next remark occurred during the same cross-examination. Defense counsel inquired:

"Q. Those were the same police officers that brought [Steve Mc-Donald]?

A. They were the same officers that accompanied Mr. McDonald into the office, yes.

\* \* \*

Q. Well why do you use the word accompany instead of \*\*\* brought?

[THE PROSECUTOR]: Objection.

THE COURT: What kind of a question is that?

[DEFENSE COUNSEL]: I'll withdraw the question."

The final allegedly improper remarks were made during the cross-examination of Detective Michael McDermott. Defense counsel inquired as to whether the detective submitted bullet fragments found in defendant's basement to the crime lab for analysis and the following exchange took place:

"Q. Did you have them [the bullet fragments] analyzed to see if—for getting—there are various ways of—

THE COURT: No. Now don't start testifying here, Mr. Cohn. You're going all over the place. You didn't send them to the crime Lab to be analyzed did you?

THE WITNESS: No.

THE COURT: Thank you.

MR. COHN: There are various ways to tell—

THE COURT: You're not from the Crime Lab, are you?

THE WITNESS: No, sir.

THE COURT: Are you an expert in that stuff?

THE WITNESS: No, your Honor.

THE COURT: But you didn't think they could be compared to anything because they were flattened and messed and all that, right?

THE WITNESS: Yes.

MR. COHN: Your Honor, I move for a mistrial now.

THE COURT: You can move for whatever you want Mr. Cohn. You're going all over the place nowhere. Objection relevancy. How's that? Your motion for a mistrial is denied. Pose a question.

MR. COHN: Have you gone to school to become a police officer?

A. Yes, sir.

THE COURT: Unbelievable, unbelievable."

■ In all of the previously described instances, the trial court was either preventing improper questions or asking questions for clarification to keep the trial moving. In the third instance, defendant interestingly alleges prejudice based on a remark by the trial court which negatively reflected on a witness for the State, not on him.

These comments do not, either individually or collectively, rise to the level of hostility or prejudice sufficient to constitute a material factor in the case in light of all the evidence. We believe that none of the trial court's remarks warrants a reversal of defendant's conviction.

Finally, defendant posits that the State improperly impeached him as it failed to lay a proper foundation for his prior statements to Detective McDermott and as these statements were not materially inconsistent with his testimony at trial. Specifically, defendant asserts that the State did not "lay an adequate foundation by directing his attention to the time, place and circumstances of [his] prior statements" to the detective.

On cross-examination, defendant was asked questions concerning his arrest on May 8, 1991, and the following colloquy occurred:

"Q. At that time you had a conversation with Detective McDermott, another detective who testified earlier today, do you recall that?

A. No, I do not. I told him I didn't want to talk to nobody until my mother came.

Q. Do you remember telling him that you weren't even in the area at the time of the shooting?

A. No, I do not. I told him I didn't want to talk to nobody until my mother came. He told me—
* * *

Q. Do you remember telling Detective McDermott later on as you talked to him that you saw Fred Taylor drive by in his Cadillac?

A. No, I did not. ***
* * *

Q. Do you remember telling Detective McDermott that the police will never recover the murder weapon?

A. No, I do not."

Generally, a proper foundation must be laid before a witness may be impeached by his prior statements. This rule was formulated to shield the witness from unfair surprise and to give the witness the opportunity to explain, deny or correct the prior statement. *People v. Henry* (1970), 47 Ill. 2d 312.

During the cross-examination of defendant, the prosecutor laid a foundation by directing defendant's attention to the day he was arrested, the detective with whom he spoke, and the statements he made to that detective. Defendant then denied any recollection of his conversation with Detective McDermott and repeatedly replied that he did not remember his responses to questions the detective posed to him.

However, defendant's statements are inherently contradictory. Although he testified that he did not recall talking to Detective McDermott, he twice stated he told the detective that he "didn't want to talk to nobody until [his] mother came." Thus, in his attempt to explain what he said to Detective McDermott, defendant acknowledged his recollection of the very conversation he professed not to remember.

Despite these plain facts, defendant maintains that had the State adequately directed his attention to the time, place and circumstances of the interview, he might have remembered it. In view of the above, this contention is without merit.

■ We believe defendant was properly apprised of the conversation about which he was examined. His attention was directed to the substance of the remarks, the identity of the person to whom they were made, and the time at which they were made. We find that the purposes of the foundation requirement were satisfied so as to eliminate the element of unfair surprise.

Relative to this issue, defendant advances the assertion that all of his prior statements should not have been admitted because they were not materially inconsistent with his trial testimony. We cannot agree.

■ The record evinces that defendant's statements at trial were directly contradictory. Defendant stated that he was not involved in the shooting of the victim. Yet, he told Detective McDermott that the police would never find the murder weapon. Defendant testified that, at the time of the shooting, he was at his grandmother's house and saw "lights flashing and police everywhere." Conversely, he told Detective McDermott that he was not in the area at the time of the shooting. Defendant further testified that he did not see the victim drive by in his car; however, he told the detective the opposite.

Although the law does not predicate admissibility of a prior statement on the absolute inconsistency between it and the present statement, defendant's prior statements were absolutely inconsistent. This court has held that inconsistency in this context "does not require a direct contradiction, but only a tendency to contradict the witness' present testimony. [Citation.] This determination is within

the broad discretion of the trial judge." *People v. Hastings* (1987), 161 Ill. App. 3d 714, 719.

Defendant's completely inconsistent statements unquestionably fall within this "tendency to contradict" definition of inconsistency and we accordingly find that the trial court did not abuse its discretion in admitting defendant's prior statements.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HOFFMAN and THEIS, JJ., concur.