THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL BARTON, Defendant-Appellant.

Fifth District   No. 5—94—0486

Opinion filed February 28, 1997.

Daniel M. Kirwan and Janet Gandy Fowler, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert B. Haida, State's Attorney, of Belleville (Norbert J. Goetten and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, of counsel), and Philip B. Alfeld, of Mt. Vernon, for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial defendant, Michael Barton, was found guilty of first-degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1) (now 720 ILCS 5/9—1(a)(1) (West 1994)) and sentenced to 60 years in the Department of Corrections. In this cause, defendant contends that (1) he was denied a fair trial due to ineffective assistance of counsel because his counsel recognized that the testimony of three crucial witnesses against defendant was obtained by improper coercion and duress and yet defense counsel failed to object to the use of such testimony, and (2) he was denied a fair trial due to the State's improper use of a prior inconsistent statement by witness Francell McGuire as substantive evidence. We reverse and remand for a new trial.

I

Defendant was charged with the first-degree murder of the victim, Terri Hammond, who died as the result of a gunshot wound. The first trial ended in a hung jury. Prior to the start of the second trial, defense counsel presented an oral motion *in limine* to prohibit the State from introducing a statement by Francell McGuire, defendant's ex-girlfriend, with whom he had three children, as substantive evidence under section 115—10.1 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115—10.1 (West 1992)). Defendant's motion was granted.

At the first trial, McGuire testified that defendant was with her

the entire evening of April 17, 1993, the date the victim was murdered, and that defendant never told her about a shooting that occurred on that date. The State confronted McGuire with her April 21, 1993, statement in which she implicated defendant by telling police that defendant told her a white woman at a trailer had fired a shot at him and he had fired a shot back. McGuire denied ever making such a statement. McGuire explained that when she was initially questioned by police at 4 a.m. on April 21, 1993, she told police that defendant was with her the entire evening of April 17, 1993. McGuire testified that the statement implicating defendant was given later in the day, but that she never told the investigating officer anything to implicate defendant—the officer just wrote it down, and she signed it. McGuire also admitted making some corrections to the written document. McGuire was subpoenaed by the State for the second trial but failed to appear, and the trial court declared McGuire unavailable. Over defendant's objection, McGuire's testimony from the first trial was read into evidence.

Curtis McCall, one of the investigating officers, testified that he interviewed Francell McGuire at the sheriff's department at approximately noon on April 21, 1993. McCall told McGuire that he knew that her statement given earlier in the day was untrue. According to McCall, McGuire then gave a statement implicating defendant. When McGuire provided the statement, she was released. McCall admitted that McGuire had been arrested, placed in handcuffs, and taken to jail overnight, even though there were no charges pending against her. McGuire was taken to the jail to answer questions concerning defendant. McCall also admitted that this same procedure of taking a witness to jail for questioning was repeated with approximately 15 to 20 other potential witnesses.

In addition to McGuire's testimony, defendant also complains about the testimony of two additional witnesses for the State, Quinton Billups and Mario Haynes. Billups and Haynes both implicated defendant in the murder of the victim. Both testified that they were with defendant on the evening of the shooting, and both testified that defendant admitted to shooting the victim. Billups specifically testified that on April 17, 1993, he was at William Rush's house with defendant, Mario Haynes, and Marcus Rush. Billups, Marcus Rush, and defendant left in defendant's automobile to purchase marijuana. Billups testified that the muffler on defendant's vehicle was "loud." According to Billups, they could not come up with enough money to make a purchase, so they went back to William Rush's house. Billups then stated that between 8:30 p.m. and 9 p.m., the trio again left to try to obtain marijuana at a trailer located between Centreville and

Cahokia. Defendant pulled up in the driveway and went to the front of the trailer. Rush got out and went to the front of the vehicle. Billups remained inside the car and could not see what defendant was doing. Billups testified that he heard a gunshot and got out of the car and ran. Defendant then directed Billups to get back in the car. Billups asked defendant "What happened?" and defendant told him that a white woman tried to shoot him. Defendant then drove to a liquor store and examined himself to see if he had been shot. Billups also testified that after defendant was arrested, defendant called him from jail wanting to know if Billups implicated him. Billups testified, "[Defendant wanted me to] put someone else in his place, saying that somebody paid me to say that he was there." Defendant called Billups from jail on other dates, but Billups stopped accepting the calls.

On cross-examination, Billups testified that he was taken into custody on April 20, 1993, and was told that he was being held for investigation of a homicide. Billups admitted making numerous statements about the incident. When first questioned by police officers, Billups denied having any knowledge of the victim's murder. After that statement, Billups was taken to a cell. On April 21, 1993, Billups was again questioned by police and again denied any knowledge of the shooting. Billups was again placed in a holdover cell. On April 22, 1993, Billups was once again questioned about the victim's murder. According to Billups, once he gave a statement implicating defendant, he was released from jail. Billups was not charged with any offense in conjunction with the shooting.

Mario Haynes testified that on April 17, 1993, he saw defendant, Billups, and Marcus Rush at William Rush's house, at which time Billups was discussing a burglary. Haynes testified that Marcus Rush is his brother and that William Rush is now deceased. Haynes did not hear anyone discussing a marijuana purchase. Haynes testified that he heard Billups say that Billups knew of a house in Cahokia that they could "hit" and that he heard defendant say he was ready. Defendant, Billups, and Marcus Rush then left. Later that evening, Haynes again saw defendant at William Rush's house. Haynes could not remember what defendant said at that time, but he acknowledged that he told the police in his statement that he heard defendant tell William Rush that defendant went to a drug house and that a white female came to the door with a gun. Haynes testified that when the woman saw defendant, she tried to shut the door, but defendant stuck his foot inside before she could shut the door, and defendant shot her. Haynes also admitted that during his testimony in the first trial he testified that defendant told him that he thought the victim fired a shot.

On cross-examination, Haynes explained that one night in April 1993, police officers came to his house, placed him in handcuffs, and took him to jail. According to Haynes, he suffered a seizure earlier that day and was ill. The officers insisted that Haynes was Marcus Rush, who was with defendant at the time of the shooting. Haynes repeatedly told officers that he was not Rush, but they did not believe him and took him to jail. Haynes testified that he could not remember how long he was in the jail and that he was not allowed to call anyone. Haynes admitted that he gave a statement implicating defendant, but he testified that a police officer wrote the statement, he signed it, and he could not read the contents of that statement. Haynes explained that he only attended school until the tenth grade and was in special education classes. Soon after Haynes made the statement, he was released from jail. Haynes stated that he has a difficult time remembering things because of the seizures he suffers. Haynes did remember that the muffler on defendant's car was loud.

Belinda Burnine also testified for the State. She was at the victim's trailer at the time of the shooting. She heard a "car with a loud sound" pull up in the driveway. Burnine testified that the victim, armed with a gun, went to the door and opened it. Burnine could not see who was at the door, due to her position on the couch. She just heard a man ask if the victim's boyfriend was home. The man attempted to open the door, and the victim tried to shut it. As Burnine got up to assist the victim, she heard a gunshot and saw that the victim had been shot. Burnine ran out of the back door of the trailer and saw someone getting into a car parked in the driveway, but she could not identify that person. Burnine testified that the victim and her boyfriend sold marijuana out of the trailer.

Michael Cadman, a deputy United States marshall, testified that he arrested defendant in Chicago on the instant offense on September 28, 1993, at approximately 8:30 a.m. At that time, defendant was with Francell McGuire and two small children at his brother's apartment. Defendant later told Cadman that when he found out he was wanted for the shooting, he immediately left for St. Louis, Missouri, and later went to Chicago.

During defense counsel's closing argument, he stated that he was "troubled" that law enforcement officers "rounded up and locked up" McGuire, Billups, and Haynes in order to obtain statements implicating defendant. The jury was instructed on the use of witnesses' prior inconsistent statements. The jury was instructed that such statements were to be considered only for impeachment purposes, specifically, "only for the purpose of deciding the weight to be given the testimony you heard from the witness stand in this courtroom." De-

fendant was convicted and sentenced to 60 years in the Department of Corrections.

## II

The first contention raised by defendant is that he was denied a fair trial due to ineffective assistance of counsel because his counsel recognized that the testimony of three crucial witnesses against defendant was obtained by improper coercion and duress by law enforcement officers and yet defense counsel failed to object to the use of such testimony. Defendant asks us to reverse his conviction and remand for a new trial or, in the alternative, to remand this case for a hearing to determine whether the testimony of McGuire, Billups, and Haynes was obtained by improper means. The State replies that defendant did not have standing to move to suppress the testimony of these three witnesses because it was not defendant's fourth amendment (U.S. Const., amend. IV) rights which were allegedly violated. After careful consideration, we agree with the State that defendant does not have standing to contest the voluntariness of these statements.

■ In *People v. James*, 118 Ill. 2d 214, 514 N.E.2d 998 (1987), our supreme court stated:

> "It is a fundamental principle that a claim to suppress the product of a fourth amendment violation can be asserted 'only by those whose rights were violated by the search or seizure itself.'" *James*, 118 Ill. 2d at 226, 514 N.E.2d at 1003.

In *James*, the defendant was arrested solely on the basis of the codefendant's statements to the arresting officer. The *James* court determined that the defendant did not have standing to contest the legality of the codefendant's arrest, even though the defendant's confession was obtained after being confronted with statements illegally obtained from his codefendant. *James*, 118 Ill. 2d at 226, 514 N.E.2d at 1003. The *James* court explained:

> "Here, the victim of the illegal arrest *** has standing to seek suppression of the fruit of that arrest. He has, in fact, successfully done so. [The codefendant], on the other hand, may be aggrieved by the admission of the product of *someone's* illegal arrest, but his *personal* privacy rights have not been violated." (Emphasis in original.) *James*, 118 Ill. 2d at 226, 514 N.E.2d at 1003.

Likewise, in the instant case, only the witnesses, McGuire, Billups, and Haynes, have standing to seek the suppression of their statements made to police officers.

■ There is a line of cases which concludes that a defendant does have standing to question the voluntary nature of another's statement, but this is only when the statement is being used by the State

to *impeach* a defense witness. See *People v. Bacon*, 2 Ill. App. 3d 324, 333, 276 N.E.2d 782, 787-88 (1971). Impeachment evidence is not admitted as proof of the facts as stated in court but is used to cast doubt on the testimony of the witness by showing his inconsistency. *People v. Tate*, 30 Ill. 2d 400, 403, 197 N.E.2d 26, 28 (1964). Impeachment, however, is an entirely different situation than what is presented in the instant case, especially with regard to Billups' and Haynes's testimony.

■ Here, Haynes and Billups testified live at the second trial, and their testimony was virtually the same as the contents of their respective statements to police, which implicated defendant. We do note, however, that Haynes's testimony was not as strong as Billups', since Haynes could not remember the events of April 17, 1993. Consequently, the prosecutor resorted to asking him whether he remembered specific portions of his testimony from the first trial, and Haynes stated that he did recall giving such statements. Nevertheless, since both Haynes's and Billups' testimony at trial was similar to their statements to the police, there was little to be gained in suppressing their statements to police. There is much to be gained, however, in suppressing a defense witness's statement given to the police which is contrary to that witness's testimony at trial. Therefore, a finding that a defendant has standing to contest the voluntary nature of a defense witness's earlier statement is dissimilar from the facts of the instant case. We agree with the State that defendant did not have standing to question the voluntariness of Billups' and Haynes's statements made to the police and, thus, defense counsel was not ineffective for failing to pursue a motion to suppress.

### III

McGuire's testimony, however, is more complicated, as she failed to appear at the second trial, and the trial court allowed her testimony from the first trial to be read into evidence. We choose to address McGuire's testimony in the context of the second issue raised by defendant, whether defendant was denied a fair trial due to the State's use of a prior inconsistent statement by McGuire. Defendant contends that the State improperly used as substantive evidence McGuire's prior inconsistent statement, a statement given to police in which McGuire stated that defendant admitted to her that he had been involved in the murder. The State first responds that since this is the first time this issue has been raised, defendant has waived the issue. Second, the State replies that inasmuch as McGuire's testimony contradicted and damaged the State's case, it was proper to impeach McGuire with the prior inconsistent statement, and that the prosecu-

tor did not improperly argue the statement as substantive evidence. We find that the introduction of McGuire's prior inconsistent statement constituted substantive evidence and that such an error is plain error, reviewable pursuant to Supreme Court Rule 615(a). 134 Ill. 2d R. 615(a).

■ It is black-letter law that a witness's prior inconsistent statement is admissible only to attack his credibility and cannot be admitted as proof of the substance of the statement. *People v. Gant*, 58 Ill. 2d 178, 317 N.E.2d 564 (1974). The purpose of impeachment is to destroy credibility, not to prove the facts stated in the impeaching statement, and what a witness says out of court and out of the presence of defendant is pure hearsay and incompetent. *People v. McKee*, 39 Ill. 2d 265, 270, 235 N.E.2d 625, 628 (1968).

■ Here, McGuire testified at the first trial that defendant was with her the entire evening of April 17, 1993, and that defendant made no mention to her about a shooting on that date. The State then confronted McGuire with People's exhibit 21, a four-page statement she gave to police officer McCall on April 21, 1993, in which she stated that defendant told her that a white female came to the front door of the trailer and fired a shot and defendant fired a shot in return. McGuire denied making such a statement to McCall.

At the second trial, defendant filed a motion *in limine* to prohibit the State from introducing this statement as substantive evidence. The trial court granted the motion. However, because McGuire failed to appear, the State moved to have McGuire declared unavailable, so that the State could use as evidence McGuire's testimony from the first trial. The trial court, over defendant's objection, granted the State's motion.

Upon review of McGuire's testimony, it becomes painfully obvious that the State's introduction of McGuire's testimony from the first trial serves no other purpose than to highlight McGuire's statement made to McCall on April 21, 1993, in which McGuire implicated defendant. McGuire's testimony at the first trial actually gave defendant an alibi. The only plausible explanation for the State's introduction of McGuire's testimony was to use McGuire's prior inconsistent statement as substantive evidence against defendant. Even though the trial court instructed the jury that the prior inconsistent statement could only be used to assist in deciding the weight to be given the testimony at trial, in our estimation this did nothing to correct the problem in the instant case. See *Tate*, 30 Ill. 2d at 403-04, 197 N.E.2d at 28 (a discussion of the difficult mental operation imposed upon jurors by allowing impeachment of a witness by a prior inconsistent statement). We find that it was error for McGuire's testimony

from the first trial to be introduced by the State at the second trial because McGuire's testimony at the first trial did nothing to advance the State's case.

In response, the State contends that there is other sufficient competent evidence to support defendant's conviction for murder, *viz.*, the testimony of Billups and Haynes, so that any error caused by the introduction of McGuire's testimony is harmless at best. We disagree. First, the fact that the jury was hung in the first trial indicates that the evidence in this case is close. Second, as we previously discussed, Haynes's testimony in the second trial was not overwhelming. Haynes testified that he could not remember what occurred on April 17, 1993, and that he suffered a seizure on April 21, 1993, the date he was taken in for questioning in conjunction with this case and allegedly gave an incriminating statement against defendant. The prosecutor did most of the testifying for Haynes at the second trial by asking him whether he made specific statements at the first trial. Third, while Billups' testimony was more damaging, it is somewhat suspicious in light of the fact that the record reflects that Billups himself was at one time a likely suspect in this homicide. Also disturbing was information brought out on the cross-examination of Billups by defense counsel. Billups testified that he was held for almost three days at the county jail before implicating defendant. After considering the evidence as a whole, we conclude that defendant's conviction was based in part on the incompetent evidence presented during the reading of Francell McGuire's testimony from the first trial in which her prior inconsistent statement was used as substantive evidence against defendant. The introduction of this highly prejudicial evidence requires that this case be reversed and the cause be remanded for a new trial free from such prejudicial error.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

MAAG and HOPKINS, JJ., concur.