THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. RICHARD DeSANTIS, Defendant-Appellee.

First District (5th Division)   No. 1—99—1256

Opinion filed December 22, 2000.—Rehearing denied March 29, 2001.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth

T. McCurry, and Jon J. Walters, Assistant State's Attorneys, of counsel), for the People.

Law Offices of James J. Cutrone, of Chicago (James J. Cutrone, of counsel), for appellee.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Defendant, Richard DeSantis, was charged with two counts of obstructing justice for leaving Illinois and concealing himself with the intention of obstructing the prosecution of Frank Caruso, Victor Jasas and Michael Kwidzinski, who were each charged with attempted murder, aggravated battery and hate crimes for the beating of a black child, Lenard Clark. Defendant filed a motion to suppress written and oral statements he made to police during the investigation into the Clark beating. Defendant claimed that he was unable to knowingly waive his fifth amendment right to counsel because he was unaware that his attorney was at the police station attempting to communicate with him. After a hearing on defendant's motion to suppress, the trial court found that the interrogation was not custodial and the statements were given voluntarily. The trial court denied the motion to suppress as to oral statements made by defendant before his attorney arrived, but granted the motion as to the written statement taken and signed by defendant after his attorney arrived, relying on the holding in *People v. McCauley*, 163 Ill. 2d 414, 645 N.E.2d 923 (1994). The State appeals from that portion of the trial court's ruling granting defendant's motion to suppress the written statement. For the reasons that follow, we reverse and remand.

At the suppression hearing, defendant testified that at about 1 p.m. on Saturday, March 22, 1997, his sister told him that two detectives had come to their house looking for him and she gave him the business card they had left. While at Hey Bud's restaurant at 56th and Pulaski, defendant called the number on the business card. Defendant testified that the officer told him to wait at the restaurant until he could come and pick him up. Defendant stated that he did not call his lawyer after receiving the business card from the police or after calling the police. Approximately 15 minutes later, two officers arrived. Defendant testified that the officers told him to come outside with them, read him his rights, handcuffed him, placed him in the back of their car, and took him to Area One police headquarters.

At Area One, defendant stated that his handcuffs were removed and, over the course of several hours, he was moved to several different rooms within the building. Defendant stated that, throughout the evening, he was questioned by police officers about the Clark beating,

which had occurred in Armor Park on the previous evening. Defendant testified that he denied any knowledge of the incident and stated that he requested his attorney on several occasions. Defendant admitted that he spoke to an assistant State's Attorney at the time that he signed the written statement, but claimed that he did not speak to her between the time they were introduced and the time that he signed the written statement. He stated that most of the statement was incorrect but acknowledged that the personal information and the statements regarding his friendship with Caruso, Jasas, and Kwidzinski were true.

Defendant stated that he was placed in a lineup and afterward was again interviewed by the police. After he had been in the lineup room approximately nine hours, he recognized the voice of John O'Malley, his attorney. Defendant heard O'Malley mention his name and ask for him, but the police would not permit O'Malley to speak with him. Defendant claimed that he signed the statement shortly thereafter because the police told him they would let him go if he signed the statement and that he would be charged with a crime if he did not sign the statement.

John O'Malley testified that he was an attorney and longtime friend of the DeSantis family. He stated that on March 23, 1997, defendant's mother came to his home and told him she thought defendant was at the police station. O'Malley testified that he arrived at the station at about 9:20 a.m. He stated that he was directed to the detective unit, where he identified himself as an attorney and asked to see defendant. O'Malley repeated his request approximately 10 minutes later and was told that a detective would be out to speak with him. O'Malley testified that Detective Stanley Turner saw him a few minutes later and told him that he was not sure whether defendant was going to be a witness or suspect, but he would not allow O'Malley to see him. O'Malley continued waiting and asking to see his client. After waiting for some time, O'Malley testified that he again saw Detective Turner and asked him why he could not see defendant. He stated that Detective Turner merely told him he was tired and left. O'Malley testified that he waited at the station for approximately two hours before he was allowed to see defendant in the lineup room.

Sergeant David Jarmusz of the Chicago police testified that Detective Glen Mathews asked Jarmusz to drive him to the restaurant to pick up defendant, a witness to a crime. Only Mathews spoke to defendant in the restaurant, and Jarmusz did not recall what Mathews said. Jarmusz stated that he did not handcuff defendant, no one told defendant he was under arrest, and defendant traveled with them in the police car to the station. During the ride, Jarmusz and Mathews

did not speak to defendant. Jarmusz testified that when they arrived at Area One defendant was placed in the lineup room and was never placed in a smaller room. He testified that the lock on the lineup room door is never utilized and that he did not have a key.

Detective Glen Mathews testified that he first learned of defendant early in the afternoon of March 22, from an anonymous caller who said that Jasas, Michael Cutler, and defendant were involved in the Clark beating. However, several other witnesses Mathews had spoken to about the beating had not named defendant. He testified that he and Jarmusz went to pick up defendant at Hey Bud's, where defendant had suggested they meet. At the restaurant, Mathews asked defendant if he would return to the station with them to help them. Mathews stated that defendant agreed to go with them and was not handcuffed.

Mathews testified that defendant was taken to the lineup room, but he was not handcuffed and he was not told he was under arrest. Mathews asked defendant where he had been the previous evening and defendant responded that he had been with his girlfriend. Mathews stated that defendant was then placed in a lineup as a filler and that the subject of the lineup was Caruso. Mathews said that defendant remained in the lineup room after the lineup, but the door was unlocked. Mathews left defendant in the room alone and had a telephone conversation with defendant's girlfriend and her mother.

Mathews testified that he returned to the lineup room at 2 a.m., with Jarmusz. At that time, Mathews advised defendant of his rights under *Miranda* and told defendant that he knew defendant was lying to him because his girlfriend did not corroborate his story. Mathews stated that defendant then admitted that he saw Caruso strike the smaller of the two black children, then saw Caruso chase them. According to Mathews' testimony, defendant also said that Jasas and Kwidzinski chased Clark, but defendant did not say that he had personally laid a hand on the victim. Mathews reentered the lineup room after 5:40 a.m. to bring defendant breakfast.

Mathews stated that defendant was never handcuffed, placed in a holding cell, or fingerprinted. He stated that he did not fill out an arrest report or obtain a central booking number for defendant. He stated that defendant was never placed under arrest and went home sometime after he gave a handwritten statement. Mathews testified that he never threatened or promised anything to defendant, and defendant never requested to call his lawyer.

Detective Stanley Turner testified that defendant was not a suspect when he was picked up at the restaurant. He stated that one of the victims of the beating, Clevon Nicholson, viewed the lineup in

which defendant was a filler, identified Caruso as one of the individuals who beat him, and identified defendant as the person who stopped Caruso, Kwidzinski, and Jasas from beating him. Turner stated that another witness to the lineup identified defendant as one of the crowd present at the beating, but he did not say defendant harmed anyone. Turner said that he spoke to defendant a couple of times in the lineup room. He asserted that defendant was never handcuffed, told he was under arrest, or fingerprinted. Turner also stated that he never prepared an arrest report for defendant. Turner said he did not threaten or promise defendant anything, and defendant never requested an attorney.

Turner testified that he was present at 9:40 a.m., when Assistant State's Attorney (ASA) Kari Mason took a written statement from defendant. He stated that Mason explained who she was, advised defendant of his rights, had defendant read and sign a portion of the statement, and asked defendant questions to which defendant gave answers. Mason wrote down everything in the statement in front of defendant, and when she was done writing she asked defendant to read it. Defendant read the statement and then Mason read it back to him. Turner stated that corrections were made to the statement and defendant, Mason and Turner initialed the corrections. Turner and defendant signed each page, and defendant placed his signature beneath the portion of the statement advising defendant of his rights under *Miranda*. Turner testified that he never told defendant to sign the statement and he did not tell defendant he could go home if he signed it. Turner testified that he did not speak to defendant again and that he did not speak to defendant's attorney at all that day.

ASA Kari Mason testified that she spoke to defendant, who was not handcuffed, in the lineup room sometime after midnight. Mason's description of the process of taking defendant's statement largely reflected that of Detective Turner and will not be repeated here. Mason testified that the entire process of taking the written statement could have taken as much as three hours to complete. Mason said that she never saw defendant handcuffed, he was always in the lineup room, and he was not charged with any offense on March 22 or March 23. She also stated that she never met O'Malley.

Charles Burns testified that he was the supervisor of the felony review unit of the Cook County State's Attorney's office on March 23, 1997. Burns testified that he arrived at Area One between 12:30 and 1 p.m. that day. While there, Burns spoke to O'Malley in the lineup room. Burns testified that O'Malley informed him that he had spoken with defendant. Burns informed O'Malley that defendant was to appear before the grand jury the next day, and if he did not appear de-

fendant would be subpoenaed. Burns testified that O'Malley did not appear upset and he did not complain that he had not been allowed to see defendant. To Burns' knowledge, defendant was not under arrest at any time, and he did not recall seeing Detective Turner at the station that day.

At the conclusion of the hearing, the trial court made several findings. The court found that the credible evidence was that defendant was not seized or arrested when he called the police and agreed to meet with them on March 22, 1997. The court found that defendant chose the place and time to meet the police, he was not handcuffed, and he agreed to go to the station with the detectives and cooperate with them. The court also pointed out that no arrest procedures took place and that there was no processing or fingerprinting of defendant upon his arrival at Area One or later. The court found that, later in the evening, the police believed defendant's statement that he had no knowledge of the incident was not truthful, and defendant was advised of his rights under *Miranda* at 2 a.m. The trial court found that defendant waived those rights and chose to continue speaking with the police at that time.

The trial court found that defendant's testimony that he continually asked for an attorney was not credible. The court found it was credible, however, that after defendant became aware that the statements of other witnesses showed that he was present at the incident, he admitted his presence to the police. The court found that defendant voluntarily gave the oral and handwritten statements to the police and ASA Mason, and defendant was not coerced or threatened.

The court found that defendant's attorney was present at Area One and seeking to speak to defendant at the time the statement was being written and that defendant and ASA Mason were unaware the attorney was present. Consequently, the court found that defendant's waiver of his rights for the written statement was voluntary, but not knowing, because defendant was not informed that his attorney was at the station asking to see him. The court ruled that defendant's oral statements made prior to the attorney's arrival would not be suppressed, but that the written statement made after the attorney's arrival would be suppressed, even though defendant was not seized or under arrest. At a subsequent court hearing, the trial court reiterated that defendant "was not a custodial suspect" at the time of the interviews.

■ We will first address the issue of standing, as the State asserts that defendant had no standing to move to suppress his statements. The law is clear that a defendant has no standing to raise an alleged violation of a witness' fifth amendment rights. *People v. Govea*, 299 Ill.

App. 3d 76, 84, 701 N.E.2d 76 (1998); *People v. Adams*, 283 Ill. App. 3d 520, 524, 669 N.E.2d 1331 (1996). This is so because the constitutional privilege against self-incrimination is a personal privilege. *Adams*, 283 Ill. App. 3d at 524.

Our supreme court in *People v. James*, 118 Ill. 2d 214, 226, 514 N.E.2d 998 (1987), held that "[i]t is a fundamental principle that a claim to suppress the product of a fourth amendment violation can be asserted 'only by those whose rights were violated by the search or seizure itself.' " As defendant asserts that his personal rights were violated, we find that, under the circumstances of this case, defendant has standing to move to suppress his statements. See *People v. Barton*, 286 Ill. App. 3d 954, 959, 677 N.E.2d 476 (1997).

On appeal, defendant concedes that, had he attended the trials of the individuals charged with the beating of Lenard Clark, he could not have moved to suppress his statements as the statements do not incriminate him and that he could not have invoked his fifth amendment rights to protect a third party from prosecution. See *People v. Cassell*, 283 Ill. App. 3d 112, 119, 669 N.E.2d 655 (1996); *People v. Gossitt*, 259 Ill. App. 3d 825, 829, 630 N.E.2d 1224 (1994); *People v. Cooper*, 202 Ill. App. 3d 336, 341, 559 N.E.2d 942 (1990) ("the fifth amendment right against self-incrimination may only be exercised where the witness has reasonable cause to suspect the possibility of subsequent prosecution from a direct answer").

On appeal, the State argues that defendant's written statement should not have been suppressed because defendant was not in custody when the statement was given and signed by him. As a result, the State asserts, defendant did not have a right to counsel under the fifth amendment because defendant was never subjected to a custodial interrogation. Defendant counters that the written statement was properly suppressed because he was deprived of his right to counsel by the failure of police to inform him of the presence of his attorney at the station.

■ We first address the applicable standard of review. The Supreme Court has held that, when an appellate court reviews rulings on a motion to suppress involving questions of probable cause, they are reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996). Our supreme court recently analyzed the applicability of *Ornelas* to motions to suppress statements. The court held that reviewing courts are to accord great deference to the trial court's factual findings, reversing those findings only when they are against the manifest weight of the evidence. However, the ultimate question of whether the statement was voluntary is to be reviewed *de novo*. *In re G.O.*, 191 Ill. 2d 37, 50, 727 N.E.2d 1003 (2000).

■ In *Miranda v. Arizona*, 384 U.S. 436, 445, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612 (1966), the Supreme Court addressed "the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way." The Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612. The Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612. The ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 1279, 103 S. Ct. 3517, 3520 (1983).

The Supreme Court clearly stated that its intention was to "dispel the compulsion inherent in custodial surroundings." *Miranda*, 384 U.S. at 458, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619. Furthermore, the Supreme Court has consistently held that the safeguards laid out in *Miranda* do not apply outside the context of the inherently coercive custodial interrogations for which they were designed. *Minnesota v. Murphy*, 465 U.S. 420, 430, 79 L. Ed. 2d 409, 421, 104 S. Ct. 1136, 1143-44 (1984).

■ In determining whether an interrogation is custodial, courts consider several factors, including: (1) the time and place of the confrontation; (2) the number of police officers present; (3) the presence or absence of family or friends; (4) any indicia of a formal arrest procedure, such as physical restraint, the show of weapons or force, booking or fingerprinting; and (5) the manner by which the individual arrived at the place of the interrogation. *People v. Melock*, 149 Ill. 2d 423, 440, 599 N.E.2d 941 (1992). The trial court's finding on the issue of custody is a question of fact, and we will not disturb that finding unless it is manifestly erroneous. *People v. Wheeler*, 281 Ill. App. 3d 447, 458, 667 N.E.2d 158 (1996).

Defendant argues that the police believed him to be a suspect and asserts that this court should look to defendant's and the police officers' subjective perspectives as well as the police officers' intentions to determine whether defendant was in custody. We disagree.

The United States Supreme Court in *Stansbury v. California*, 511 U.S. 318, 319-23, 128 L. Ed. 2d 293, 296-98, 114 S. Ct. 1526, 1527-29 (1994), reaffirmed its holdings regarding custody and the applicability of the protections of *Miranda*:

804

"Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 128 L. Ed. 2d 293, 298, 114 S. Ct. 1526, 1529 (1994).

■ Thus, the determination of custody involves an objective analysis of the circumstances surrounding the interview as a reasonable and innocent person in the defendant's position would perceive them. *People v. Goyer*, 265 Ill. App. 3d 160, 167, 638 N.E.2d 390 (1994). In this case, defendant chose the time to contact the police and the location at which they would meet. Defendant stated that he was cooperating with the police officers, and the trial court found that he agreed to go to the police station with them. Defendant rode to the station in the back of the police car, but the court found that he was not handcuffed at any time. No arrest procedures ever took place, and defendant was not processed or fingerprinted. The court also found that defendant was not coerced or threatened by the police at any time. Citing these factors, the trial court held that defendant was not under arrest and was not a custodial suspect. In light of the deferential standard of review as well as the factors that support the trial court's finding, we conclude that the trial court's finding that defendant was not in custody is not manifestly erroneous.

■ The fifth amendment right to counsel applies only to custodial interrogations. *McNeil v. Wisconsin*, 501 U.S. 171, 178, 115 L. Ed. 2d 158, 168, 111 S. Ct. 2204, 2209 (1991); *Melock*, 149 Ill. 2d at 443. If a defendant is not in custody, even a clear and unequivocal request for an attorney does not implicate any constitutionally protected right, and the police are not required to end an interview. *Goyer*, 265 Ill. App. 3d at 168. Furthermore, the sixth amendment right to counsel "attaches only at the initiation of adversary criminal proceedings, [citation], and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel." *Davis v. United States*, 512 U.S. 452, 456-57, 129 L. Ed. 2d 362, 369-70, 114 S. Ct. 2350, 2354 (1994).

■ Defendant asks us to distinguish *Goyer* from this case on its facts because the defendant in *Goyer* was not interviewed in a police station. However, other cases have held interviews that took place in police stations did not involve custodial interrogations and consequently the fifth amendment right to counsel did not apply. See *Melock*, 149 Ill. 2d at 442-43; *People v. Patterson*, 146 Ill. 2d 445, 455, 588 N.E.2d 1175 (1992); *People v. Willoughby*, 250 Ill. App. 3d 699, 718-19, 620 N.E.2d 617 (1993). Because defendant was not in custody, his fifth

amendment right to counsel had not attached at the time he gave his written statement to ASA Mason at the police station.

Defendant urges us to affirm the trial court's ruling based on our supreme court's ruling in *People v. McCauley*, 163 Ill. 2d 414, 645 N.E.2d 923 (1994). In *McCauley*, as here, an attorney retained by the family of the defendant arrived at the police station where the defendant was being interrogated and was refused permission to see his client.

The same factual situation was addressed by the United States Supreme Court in *Moran v. Burbine*, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986). The Court concluded that events occurring outside the presence of a suspect and entirely unknown to him have no bearing on the suspect's capacity to comprehend and knowingly waive a constitutional right. The Court declared that "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Moran*, 475 U.S. at 422-23, 89 L. Ed. 2d at 422, 106 S. Ct. at 1141.

Our supreme court in *McCauley* declined to follow *Moran*, relying on the proposition that state constitutional protections may be broader than federal constitutional protections. *McCauley*, 163 Ill. 2d at 421. Article I, section 10, of the Illinois Constitution (Ill. Const. 1970, art. I, § 10) provides that "[n]o person shall be compelled in a criminal case to give evidence against himself nor be twice put in jeopardy for the same offense."

In holding that the police action in *McCauley* violated the defendant's state constitutional rights, the majority said:

> "The day is long past in Illinois, however, where attorneys must shout legal advice to their clients, *held in custody*, through the jailhouse door. In this case, we determine that our State constitutional guarantees afforded defendant a greater degree of protection. Our State constitutional guarantees simply do not permit police to delude *custodial suspects*, exposed to interrogation, into falsely believing they are without immediately available legal counsel and to also prevent that counsel from accessing and assisting their clients during the interrogation. (See Ill. Const. 1970, art. I, §§ 2, 10.)" (Emphasis added.) *McCauley*, 163 Ill. 2d at 423-24.

In holding that the actions of the police in *McCauley* violated the defendant's due process rights, the majority said:

> "In Illinois, due process of law requires that an accused shall be given the *benefit* of counsel. (See *United States ex rel. Hall v. Ragen*

(N.D. Ill. 1945), 60 F. Supp. 820, 821.) Due process also requires that an accused is entitled to counsel *during* any custodial interrogation. (See 11A Ill. L. & Prac. *Constitutional Law* § 477, at 410 (1981).) The State due process guarantee (article I, section 2) provides the general basis for an accused's right to the assistance as well as presence of counsel during any custodial interrogation." (Emphasis in original.) *McCauley*, 163 Ill. 2d at 441.

In the instant case, the trial court found, and we agree, that defendant was not "held in custody" or subject to "custodial interrogation." The evidence also supports the State's position that defendant was not a "suspect" or an "accused." Prior to defendant admitting his presence at the scene of the attack, the police had developed information from lineups and interviews with witnesses that defendant had attempted to aid Lenard Clark. Defendant's statements also indicated that he was only a witness.

Defendant argues that we should apply the holding of *McCauley* to defendant as the police clearly failed to tell defendant of the presence of his attorney. The State argues that we should hold that *McCauley* does not apply to witnesses. We decline to do either.

We hold that *McCauley* does not require suppression of defendant's statements as they were not given during a custodial interrogation. Therefore, defendant's state constitutional rights were not violated. We also hold that, as defendant was never an accused, the defendant's state due process rights were not violated.

As to whether the holding in *McCauley* would require suppression of defendant's statements if the trial court or we found that those statements were the result of a custodial interrogation, we do not express an opinion. In *McCauley*, our supreme court condemned police actions identical to the ones taken here. The trial court based its ruling on our supreme court's strong condemnation of this interference with an attorney's efforts to see his client. While our analysis of the applicable law leads us to reverse the trial court's order of suppression, the actions of the police were indefensible.

The dissent primarily relies upon section 103—4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103—4 (West 1998)) which is entitled "Right to Consult with Attorney." The dissent asserts that this statute was applicable to defendant as he was "restrained of his liberty." It would appear that the trial court's findings that defendant was not in custody would preclude the application of this statute. Further, the committee comments read in part: "Paragraph 103—4 says (an accused) has a right to consult with counsel at any time after being taken into custody." 725 ILCS 5/103—4, Committee Comments—1963, at 56 (West 1998). Again, defendant was not an accused at the time of his interrogation, nor was he in custody.

By way of analogy, section 4—5 of the Juvenile Court Act of 1987 requires police officers who take a minor into custody to immediately make a reasonable attempt to notify the minor's parents or guardian and also to take the minor without unnecessary delay to the nearest juvenile police officer. 705 ILCS 405/4—5(2) (West 1998). Courts have held that pursuant to this statute, where an officer questioning a juvenile learns of a person's presence in the station, the officer has an affirmative duty to stop the questioning and allow the parent to confer with the minor. *People v. Brown*, 182 Ill. App. 3d 1046, 1053, 538 N.E.2d 909 (1989). However, "(f)ailure to comply with this judicial directive, though a significant factor in the determination of voluntariness, does not compel a finding that the confession was involuntary." *People v. McNeal*, 298 Ill. App. 3d 379, 391 (1998).

Applying this principle to our case, even if we were to find that the police violated section 103—4, this would only be one factor to consider in determining whether the defendant's written statement should have been suppressed.

Finally, we note that in *People v. Finklea*, 119 Ill. App. 3d 448 (1983), cited by the dissent, the appellate court affirmed the denial of the defendant's motion to suppress statements as he was not in custody at the time of the interrogation.

■ In its findings, the trial court opined that defendant could "arguably" have been charged with obstruction of justice after the police had broken his alibi. Defendant asks us to consider this fact as being a basis for defendant invoking his right against self-incrimination. This argument is similar to that raised by the witnesses in *Gossitt* and *Cooper*. In those cases, the witnesses asserted that their fear of being charged with perjury was a valid basis for invoking their rights under the fifth amendment. This court did not agree with that argument in those cases and we reject it again here.

We note that at the time defendant gave his written statement to police, he did not have "reasonable cause to suspect the possibility of subsequent prosecution from a direct answer" (*Cooper*, 202 Ill. App. 3d at 341) and, therefore, under our holding in *Cooper*, the fifth amendment right against self-incrimination did not apply. Defendant is not being prosecuted because of his answers to the authorities. He is being prosecuted because he allegedly, possessing knowledge material to the prosecution of Frank Caruso, Victor Jasas, and Michael Kwidzinski, and with the intent to obstruct the prosecution of those individuals, knowingly left the State of Illinois and concealed himself in violation of section 31—4(c) of the Criminal Code of 1961 (720 ILCS 5/31—4(c) (West 1996)). If we were to accept defendant's argument that, because he is now charged with a criminal offense, he had a fifth

amendment right to counsel at the time of his interviews with police, it would encourage similarly situated witnesses who are reluctant to testify to flee the state.

As previously stated, we find that the trial court's determination that defendant was not in custody at the time the written statement was taken and signed was not against the manifest weight of the evidence. Therefore, as a matter of law, we reverse the trial court's ruling suppressing the written statement as defendant was not in custody and may not invoke a fifth amendment right to counsel.

■ In addition, defendant contends that his written and oral statements should be suppressed as the product of an unlawful arrest under the fourth amendment. Defendant argues that he was unlawfully seized without probable cause when he was taken to the police station and that both the written and oral statements given by him should have been suppressed by the trial court as the product of an unconstitutional seizure.

In effect, defendant seeks to cross-appeal from that part of the interlocutory ruling that was not in his favor. Whatever the merits of his attack on the trial court's ruling, that attack is not properly before this court. It is well settled that there is no basis for a defendant to appeal interlocutorily the order of a trial court denying in whole or in part a motion to suppress. *People v. Busija*, 155 Ill. App. 3d 741, 744-45, 509 N.E.2d 168 (1986). This is so even where the State appeals a trial court's order suppressing evidence pursuant to Supreme Court Rule 604(a)(1) (145 Ill. 2d R. 604(a)(1)). *People v. Bielawski*, 255 Ill. App. 3d 635, 640, 627 N.E.2d 710 (1994). Therefore, at this pretrial stage of the case, we consider only the State's challenges to the propriety of the court's order.

For the foregoing reasons, we reverse the order of the circuit court suppressing defendant's written statement and remand this matter to the circuit court for further proceedings consistent with this opinion.

Reversed and remanded.

HARTMAN, J., concurs.

JUSTICE GREIMAN, dissenting:

The majority states that "the actions of the police were indefensible." 319 Ill. App. 3d at 806. Here the police took the defendant to the police station a little after 1 p.m., placed him in a lineup, questioned him in several different rooms by several different police officers about the tragic beating of Lenard Clark and kept him at the station approximately 21 hours before he was allowed to talk with his

attorney. When his attorney arrived on the nineteenth hour, he was refused an audience with defendant and he was advised by the police that they were not sure whether defendant was "going to be a witness or suspect."

While I recognize the distinction urged by the majority between a person being questioned as a witness and a person detained as a suspect to be charged, it is difficult for me to imagine that a defendant or his attorney has any idea of what his status is when the police are unable to sort out whether he is a witness or suspect.

The philosophy of *People v. McCauley*, 163 Ill. 2d 414 (1994), is certainly broad enough to encompass a person held or restrained under this hazy status. It should be noted that, to the extent that the police refuse to permit an attorney to communicate with the defendant at the station, that is relevant in determining whether defendant is in police custody or not. *People v. Finklea*, 119 Ill. App. 3d 448 (1983). Additionally, it should be noted that the Illinois General Assembly since 1927 has been concerned with the rights of a party to consult with an attorney. Accordingly, section 103—4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103—4 (West 1998)) provides:

> "103—4. Right to Consult with Attorney. Any person committed, imprisoned or restrained of his liberty for any cause whatever and whether or not such person is charged with an offense shall, except in cases of imminent danger of escape, be allowed to consult with any licensed attorney at law of this State whom such person may desire to see or consult, alone and in private at the place of custody, as many times and for such period each time as is reasonable."

If this statute means anything, it means that this defendant, perhaps a witness, perhaps a suspect, but certainly "restrained of his liberty for any cause whatever" should have been allowed to talk with counsel at the police station.

Accordingly, I would affirm the thoughtful trial judge who declined to suppress matter that was expressed before counsel's appearance on the scene and suppressed defendant's written statement given after counsel's efforts to talk to his client.